(Slip Opinion) OCTOBER TERM, 2012 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## VANCE *v.* BALL STATE UNIVERSITY ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 11–556. Argued November 26, 2012—Decided June 24, 2013

Under Title VII, an employer's liability for workplace harassment may
depend on the status of the harasser. If the harassing employee is
the victim's co-worker, the employer is liable only if it was negligent
in controlling working conditions. In cases in which the harasser is a
"supervisor," however, different rules apply. If the supervisor's har-
assment culminates in a tangible employment action (*i.e.*, "a signifi-
cant change in employment status, such as hiring, firing, failing to
promote, reassignment with significantly different responsibilities, or
a decision causing a significant change in benefits," *Burlington In-
dustries, Inc.* v. *Ellerth*, 524 U. S. 742, 761), the employer is strictly
liable. But if no tangible employment action is taken, the employer
may escape liability by establishing, as an affirmative defense, that
(1) the employer exercised reasonable care to prevent and correct any
harassing behavior and (2) that the plaintiff unreasonably failed to
take advantage of the preventive or corrective opportunities that the
employer provided. *Faragher* v. *Boca Raton*, 524 U. S. 775, 807;
*Ellerth*, *supra,* at 765.

Petitioner Vance, an African-American woman, sued her employer,
Ball State University (BSU) alleging that a fellow employee, Saundra
Davis, created a racially hostile work environment in violation of Ti-
tle VII. The District Court granted summary judgment to BSU. It
held that BSU was not vicariously liable for Davis' alleged actions be-
cause Davis, who could not take tangible employment actions against
Vance, was not a supervisor. The Seventh Circuit affirmed.

*Held*: An employee is a "supervisor" for purposes of vicarious liability
under Title VII only if he or she is empowered by the employer to
take tangible employment actions against the victim. Pp. 9–30.

   (a) Petitioner errs in relying on the meaning of "supervisor" in gen-

eral usage and in other legal contexts because the term has varying meanings both in colloquial usage and in the law.  In any event, Congress did not use the term "supervisor" in Title VII, and the way to understand the term's meaning for present purposes is to consider the interpretation that best fits within the highly structured framework adopted in *Faragher* and *Ellerth*.  Pp. 10–14.

(b) Petitioner misreads *Faragher* and *Ellerth* in claiming that those cases support an expansive definition of "supervisor" because, in her view, at least some of the alleged harassers in those cases, whom the Court treated as supervisors, lacked the authority that the Seventh Circuit's definition demands.  In *Ellerth*, there was no question that the alleged harasser, who hired and promoted his victim, was a supervisor.  And in *Faragher*, the parties never disputed the characterization of the alleged harassers as supervisors, so the question simply was not before the Court.  Pp. 14–18.

(c) The answer to the question presented in this case is implicit in the characteristics of the framework that the Court adopted in *Ellerth* and *Faragher*, which draws a sharp line between co-workers and supervisors and implies that the authority to take tangible employment actions is the defining characteristic of a supervisor. *Ellerth*, *supra,* at 762.

The interpretation of the concept of a supervisor adopted today is one that can be readily applied.  An alleged harasser's supervisor status will often be capable of being discerned before (or soon after) litigation commences and is likely to be resolved as a matter of law before trial.  By contrast, the vagueness of the EEOC's standard would impede the resolution of the issue before trial, possibly requiring the jury to be instructed on two very different paths of analysis, depending on whether it finds the alleged harasser to be a supervisor or merely a co-worker.

This approach will not leave employees unprotected against harassment by co-workers who possess some authority to assign daily tasks.  In such cases, a victim can prevail simply by showing that the employer was negligent in permitting the harassment to occur, and the jury should be instructed that the nature and degree of authority wielded by the harasser is an important factor in determining negligence.  Pp. 18–25.

(d) The definition adopted today accounts for the fact that many modern organizations have abandoned a hierarchical management structure in favor of giving employees overlapping authority with respect to work assignments.  Petitioner fears that employers will attempt to insulate themselves from liability for workplace harassment by empowering only a handful of individuals to take tangible employment actions, but a broad definition of "supervisor" is not neces-

Syllabus

sary to guard against that concern.  Pp. 25–26.

646 F. 3d 461, affirmed.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, and THOMAS, JJ., joined.  THOMAS, J., filed a concurring opinion.  GINSBURG, J., filed a dissenting opinion, in which BREYER, SOTOMAYOR, and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 11–556

## MAETTA VANCE, PETITIONER *v.* BALL STATE UNIVERSITY

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[June 24, 2013]

JUSTICE ALITO delivered the opinion of the Court.

In this case, we decide a question left open in *Burlington Industries, Inc.* v. *Ellerth*, 524 U. S. 742 (1998), and *Faragher* v. *Boca Raton*, 524 U. S. 775 (1998), namely, who qualifies as a "supervisor" in a case in which an employee asserts a Title VII claim for workplace harassment?

Under Title VII, an employer's liability for such harassment may depend on the status of the harasser. If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions. In cases in which the harasser is a "supervisor," however, different rules apply. If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable. But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided. *Id.,* at 807; *Ellerth, supra*, at 765. Under this framework,

therefore, it matters whether a harasser is a "supervisor" or simply a co-worker.

We hold that an employee is a "supervisor" for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim, and we therefore affirm the judgment of the Seventh Circuit.

## I

Maetta Vance, an African-American woman, began working for Ball State University (BSU) in 1989 as a substitute server in the University Banquet and Catering division of Dining Services. In 1991, BSU promoted Vance to a part-time catering assistant position, and in 2007 she applied and was selected for a position as a full-time catering assistant.

Over the course of her employment with BSU, Vance lodged numerous complaints of racial discrimination and retaliation, but most of those incidents are not at issue here. For present purposes, the only relevant incidents concern Vance's interactions with a fellow BSU employee, Saundra Davis.

During the time in question, Davis, a white woman, was employed as a catering specialist in the Banquet and Catering division. The parties vigorously dispute the precise nature and scope of Davis' duties, but they agree that Davis did not have the power to hire, fire, demote, promote, transfer, or discipline Vance. See No. 1:06–cv–1452–SEB–JMS, 2008 WL 4247836, \*12 (SD Ind., Sept. 10, 2008) ("Vance makes no allegations that Ms. Davis possessed any such power"); Brief for Petitioner 9–11 (describing Davis' authority over Vance); Brief for Respondent 39 ("[A]ll agree that Davis lacked the authority to take tangible employments [*sic*] actions against petitioner").

In late 2005 and early 2006, Vance filed internal com-

plaints with BSU and charges with the Equal Employ-
ment Opportunity Commission (EEOC), alleging racial
harassment and discrimination, and many of these com-
plaints and charges pertained to Davis. 646 F. 3d 461, 467
(CA7 2011). Vance complained that Davis "gave her a
hard time at work by glaring at her, slamming pots and
pans around her, and intimidating her." *Ibid.* She alleged
that she was "left alone in the kitchen with Davis, who
smiled at her"; that Davis "blocked" her on an elevator and
"stood there with her cart smiling"; and that Davis often
gave her "weird" looks. *Ibid.* (internal quotation marks
omitted).

Vance's workplace strife persisted despite BSU's at-
tempts to address the problem. As a result, Vance filed
this lawsuit in 2006 in the United States District Court for
the Southern District of Indiana, claiming, among other
things, that she had been subjected to a racially hostile
work environment in violation of Title VII. In her com-
plaint, she alleged that Davis was her supervisor and that
BSU was liable for Davis' creation of a racially hostile
work environment. Complaint in No. 1:06–cv–01452–
SEB–TAB (SD Ind., Oct. 3, 2006), Dkt. No. 1, pp. 5–6.

Both parties moved for summary judgment, and the
District Court entered summary judgment in favor of
BSU. 2008 WL 4247836, at *1. The court explained that
BSU could not be held vicariously liable for Davis' alleged
racial harassment because Davis could not "'hire, fire,
demote, promote, transfer, or discipline'" Vance and, as a
result, was not Vance's supervisor under the Seventh
Circuit's interpretation of that concept. See *id.*, at *12
(quoting *Hall* v. *Bodine Elect. Co.*, 276 F. 3d 345, 355 (CA7
2002)). The court further held that BSU could not be
liable in negligence because it responded reasonably to the
incidents of which it was aware. 2008 WL 4247836, *15.

The Seventh Circuit affirmed. 646 F. 3d 461. It ex-
plained that, under its settled precedent, supervisor status

requires "'the power to hire, fire, demote, promote, transfer, or discipline an employee.'" *Id.*, at 470 (quoting *Hall, supra,* at 355). The court concluded that Davis was not Vance's supervisor and thus that Vance could not recover from BSU unless she could prove negligence. Finding that BSU was not negligent with respect to Davis' conduct, the court affirmed. 646 F. 3d, at 470–473.

## II

## A

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U. S. C. §2000e–2(a)(1). This provision obviously prohibits discrimination with respect to employment decisions that have direct economic consequences, such as termination, demotion, and pay cuts. But not long after Title VII was enacted, the lower courts held that Title VII also reaches the creation or perpetuation of a discriminatory work environment.

In the leading case of *Rogers* v. *EEOC*, 454 F. 2d 234 (1971), the Fifth Circuit recognized a cause of action based on this theory. See *Meritor Savings Bank, FSB* v. *Vinson*, 477 U. S. 57, 65–66 (1986) (describing development of hostile environment claims based on race). The *Rogers* court reasoned that "the phrase 'terms, conditions, or privileges of employment' in [Title VII] is an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with ethnic or racial discrimination." 454 F. 2d, at 238. The court observed that "[o]ne can readily envision working environments so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers." *Ibid.*

Following this decision, the lower courts generally held that an employer was liable for a racially hostile work environment if the employer was negligent, *i.e.,* if the employer knew or reasonably should have known about the harassment but failed to take remedial action. See *Ellerth*, 524 U. S., at 768–769 (THOMAS, J., dissenting) (citing cases).

When the issue eventually reached this Court, we agreed that Title VII prohibits the creation of a hostile work environment. See *Meritor*, *supra*, at 64–67. In such cases, we have held, the plaintiff must show that the work environment was so pervaded by discrimination that the terms and conditions of employment were altered. See, *e.g., Harris* v. *Forklift Systems, Inc.*, 510 U. S. 17, 21 (1993).

B

Consistent with *Rogers*, we have held that an employer is directly liable for an employee's unlawful harassment if the employer was negligent with respect to the offensive behavior. *Faragher*, 524 U. S., at 789. Courts have generally applied this rule to evaluate employer liability when a co-worker harasses the plaintiff.[1]

In *Ellerth* and *Faragher*, however, we held that different rules apply where the harassing employee is the plaintiff's "supervisor." In those instances, an employer may be *vicariously* liable for its employees' creation of a hostile work environment. And in identifying the situations in which such vicarious liability is appropriate, we looked to the Restatement of Agency for guidance. See, *e.g., Meri-*

---

[1] See, *e.g., Williams* v. *Waste Management of Ill.*, 361 F. 3d 1021, 1029 (CA7 2004); *McGinest* v. *GTE Serv. Corp.*, 360 F. 3d 1103, 1119 (CA9 2004); *Joens* v. *John Morrell & Co.*, 354 F. 3d 938, 940 (CA8 2004); *Noviello* v. *Boston*, 398 F. 3d 76, 95 (CA1 2005); *Duch* v. *Jakubek*, 588 F. 3d 757, 762 (CA2 2009); *Huston* v. *Procter & Gamble Paper Prods. Corp.*, 568 F. 3d 100, 104–105 (CA3 2009).

*tor*, *supra*, at 72; *Ellerth*, *supra*, at 755.

Under the Restatement, "masters" are generally not liable for the torts of their "servants" when the torts are committed outside the scope of the servants' employment. See 1 Restatement (Second) of Agency §219(2), p. 481 (1957) (Restatement). And because racial and sexual harassment are unlikely to fall within the scope of a servant's duties, application of this rule would generally preclude employer liability for employee harassment. See *Faragher*, *supra*, at 793–796; *Ellerth*, *supra*, at 757. But in *Ellerth* and *Faragher,* we held that a provision of the Restatement provided the basis for an exception. Section 219(2)(d) of that Restatement recognizes an exception to the general rule just noted for situations in which the servant was "aided in accomplishing the tort by the existence of the agency relation."[2] Restatement 481; see *Faragher*, *supra*, at 802–803; *Ellerth*, *supra*, at 760–763.

Adapting this concept to the Title VII context, *Ellerth* and *Faragher* identified two situations in which the aided-in-the-accomplishment rule warrants employer liability even in the absence of negligence, and both of these situations involve harassment by a "supervisor" as opposed to a co-worker. First, the Court held that an employer is vicariously liable "when a supervisor takes a tangible employment action," *Ellerth*, *supra*, at 762; *Faragher*, *supra*, at 790—*i.e.*, "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with

_____

[2] The Restatement (Third) of Agency disposed of this exception to liability, explaining that "[t]he purposes likely intended to be met by the 'aided in accomplishing' basis are satisfied by a more fully elaborated treatment of apparent authority and by the duty of reasonable care that a principal owes to third parties with whom it interacts through employees and other agents." 2 Restatement (Third) §7.08, p. 228 (2005). The parties do not argue that this change undermines our holdings in *Faragher* and *Ellerth*.

significantly different responsibilities, or a decision caus-
ing a significant change in benefits." *Ellerth*, 524 U. S., at
761. We explained the reason for this rule as follows:
"When a supervisor makes a tangible employment deci-
sion, there is assurance the injury could not have been
inflicted absent the agency relation. . . . A tangible em-
ployment decision requires an official act of the enterprise,
a company act. The decision in most cases is documented
in official company records, and may be subject to review
by higher level supervisors." *Id.*, at 761–762. In those
circumstances, we said, it is appropriate to hold the em-
ployer strictly liable. See *Faragher*, *supra*, at 807; *Ellerth*,
*supra*, at 765.

Second, *Ellerth* and *Faragher* held that, even when
a supervisor's harassment does not culminate in a tangible
employment action, the employer can be vicariously liable
for the supervisor's creation of a hostile work environment
if the employer is unable to establish an affirmative de-
fense.[3] We began by noting that "a supervisor's power
and authority invests his or her harassing conduct with
a particular threatening character, and in this sense, a

------------

[3] *Faragher* and *Ellerth* involved hostile environment claims premised
on sexual harassment. Several federal courts of appeals have held that
*Faragher* and *Ellerth* apply to other types of hostile environment
claims, including race-based claims. See *Spriggs* v. *Diamond Auto
Glass*, 242 F. 3d 179, 186, n. 9 (CA4 2001) (citing cases reflecting "the
developing consensus . . . that the holdings [in *Faragher* and *Ellerth*]
apply with equal force to other types of harassment claims under Title
VII"). But see *Ellerth*, 524 U. S., at 767 (THOMAS, J., dissenting) (stat-
ing that, as a result of the Court's decision in *Ellerth*, "employer liabil-
ity under Title VII is judged by different standards depending upon
whether a sexually or racially hostile work environment is alleged").
Neither party in this case challenges the application of *Faragher* and
*Ellerth* to race-based hostile environment claims, and we assume that
the framework announced in *Faragher* and *Ellerth* applies to cases such
as this one.

supervisor always is aided by the agency relation." *Ellerth*, *supra*, at 763; see *Faragher*, 524 U. S., at 803–805. But it would go too far, we found, to make employers strictly liable whenever a "supervisor" engages in harassment that does not result in a tangible employment action, and we therefore held that in such cases the employer may raise an affirmative defense. Specifically, an employer can mitigate or avoid liability by showing (1) that it exercised reasonable care to prevent and promptly correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities that were provided. *Faragher*, *supra*, at 807; *Ellerth*, 524 U. S., at 765. This compromise, we explained, "accommodate[s] the agency principles of vicarious liability for harm caused by misuse of supervisory authority, as well as Title VII's equally basic policies of encouraging forethought by employers and saving action by objecting employees." *Id.*, at 764.

The dissenting Members of the Court in *Ellerth* and *Faragher* would not have created a special rule for cases involving harassment by "supervisors." Instead, they would have held that an employer is liable for any employee's creation of a hostile work environment "if, and only if, the plaintiff proves that the employer was negligent in permitting the [offending] conduct to occur." *Ellerth*, *supra*, at 767 (THOMAS, J., dissenting); *Faragher*, *supra*, at 810 (same).

C

Under *Ellerth* and *Faragher*, it is obviously important whether an alleged harasser is a "supervisor" or merely a co-worker, and the lower courts have disagreed about the meaning of the concept of a supervisor in this context. Some courts, including the Seventh Circuit below, have held that an employee is not a supervisor unless he or she has the power to hire, fire, demote, promote, transfer, or

discipline the victim.  *E.g.,* 646 F. 3d, at 470; *Noviello* v. *Boston*, 398 F. 3d 76, 96 (CA1 2005); *Weyers* v. *Lear Operations Corp.*, 359 F. 3d 1049, 1057 (CA8 2004).  Other courts have substantially followed the more open-ended approach advocated by the EEOC's Enforcement Guidance, which ties supervisor status to the ability to exercise significant direction over another's daily work.  See, *e.g., Mack* v. *Otis Elevator Co.*, 326 F. 3d 116, 126–127 (CA2 2003); *Whitten* v. *Fred's, Inc.*, 601 F. 3d 231, 245–247 (CA4 2010); EEOC, Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors (1999), 1999 WL 33305874, *3 (hereinafter EEOC Guidance).

We granted certiorari to resolve this conflict.  567 U. S. ___ (2012).

## III

We hold that an employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.*, to effect a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Ellerth*, *supra*, at 761.  We reject the nebulous definition of a "supervisor" advocated in the EEOC Guidance[4] and substantially adopted by several courts of appeals.  Petitioner's reliance on colloquial uses

————————

[4] The United States urges us to defer to the EEOC Guidance.  Brief for United States as *Amicus Curiae* 26–29 (citing *Skidmore* v. *Swift & Co.*, 323 U. S. 134, 140 (1944)).  But to do so would be proper only if the EEOC Guidance has the power to persuade, which "depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements."  *Id.,* at 140.  For the reasons explained below, we do not find the EEOC Guidance persuasive.

of the term "supervisor" is misplaced, and her contention
that our cases require the EEOC's abstract definition is
simply wrong.

As we will explain, the framework set out in *Ellerth* and
*Faragher* presupposes a clear distinction between supervi-
sors and co-workers. Those decisions contemplate a uni-
tary category of supervisors, *i.e.*, those employees with the
authority to make tangible employment decisions. There
is no hint in either decision that the Court had in mind
two categories of supervisors: first, those who have such
authority and, second, those who, although lacking this
power, nevertheless have the ability to direct a co-worker's
labor to some ill-defined degree. On the contrary, the
*Ellerth/Faragher* framework is one under which supervi-
sory status can usually be readily determined, generally
by written documentation. The approach recommended by
the EEOC Guidance, by contrast, would make the deter-
mination of supervisor status depend on a highly case-
specific evaluation of numerous factors.

The *Ellerth/Faragher* framework represents what the
Court saw as a workable compromise between the aided-
in-the-accomplishment theory of vicarious liability and the
legitimate interests of employers. The Seventh Circuit's
understanding of the concept of a "supervisor," with which
we agree, is easily workable; it can be applied without
undue difficulty at both the summary judgment stage and
at trial. The alternative, in many cases, would frustrate
judges and confound jurors.

A

Petitioner contends that her expansive understanding of
the concept of a "supervisor" is supported by the meaning
of the word in general usage and in other legal contexts,
see Brief for Petitioner 25–28, but this argument is both
incorrect on its own terms and, in any event, misguided.

In general usage, the term "supervisor" lacks a suffi-

ciently specific meaning to be helpful for present purposes. Petitioner is certainly right that the term is often used to refer to a person who has the authority to direct another's work. See, *e.g.,* 17 Oxford English Dictionary 245 (2d ed. 1989) (defining the term as applying to "one who inspects and directs the work of others"). But the term is also often closely tied to the authority to take what *Ellerth* and *Faragher* referred to as a "tangible employment action." See, *e.g.*, Webster's Third New International Dictionary 2296, def. 1(a) (1976) ("a person having authority delegated by an employer to hire, transfer, suspend, recall, promote, assign, or discharge another employee or to recommend such action").

A comparison of the definitions provided by two colloquial business authorities illustrates the term's imprecision in general usage. One says that "[s]upervisors are usually authorized to recommend and/or effect hiring, disciplining, promoting, punishing, rewarding, and other associated activities regarding the employees in their departments."[5] Another says exactly the opposite: "A supervisor generally does not have the power to hire or fire employees or to promote them."[6] Compare *Ellerth*, 524 U. S., at 762 ("Tangible employment actions fall within the special province of the supervisor").

If we look beyond general usage to the meaning of the term in other legal contexts, we find much the same situation. Sometimes the term is reserved for those in the upper echelons of the management hierarchy. See, *e.g.,* 25 U. S. C. §2021(18) (defining the "supervisor" of a school within the jurisdiction of the Bureau of Indian Affairs as

———————

[5] http://www.businessdictionary.com/definition/supervisor.html (all Internet materials as visited June 21, 2013, and available in Clerk of Court's case file).

[6] http://management.about.com/od/policiesandprocedures/g/ supervisor1.html

"the individual in the position of ultimate authority at a Bureau school"). But sometimes the term is used to refer to lower ranking individuals. See, *e.g.,* 29 U. S. C. §152(11) (defining a supervisor to include "any individual having authority . . . to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment"); 42 U. S. C. §1396n(j)(4)(A) (providing that an eligible Medicaid beneficiary who receives care through an approved self-directed services plan may "hire, fire, supervise, and manage the individuals providing such services").

Although the meaning of the concept of a supervisor varies from one legal context to another, the law often contemplates that the ability to supervise includes the ability to take tangible employment actions.[7]  See, *e.g.,* 5

---

[7] One outlier that petitioner points to is the National Labor Relations Act (NLRA), 29 U. S. C. §152(11). Petitioner argues that the NLRA's definition supports her position in this case to the extent that it encompasses employees who have the ability to direct or assign work to subordinates. Brief for Petitioner 27–28.

The NLRA certainly appears to define "supervisor" in broad terms. The National Labor Relations Board (NLRB) and the lower courts, however, have consistently explained that supervisory authority is not trivial or insignificant: If the term "supervisor" is construed too broadly, then employees who are deemed to be supervisors will be denied rights that the NLRA was intended to protect. *E.g.*, *In re Connecticut Humane Society*, 358 NLRB No. 31, *33 (Apr. 12, 2012); *Frenchtown Acquisition Co., Inc.* v. *NLRB*, 683 F. 3d 298, 305 (CA6 2012); *Beverly Enterprises-Massachusetts, Inc.* v. *NLRB*, 165 F. 3d 960, 963 (CADC 1999). Indeed, in defining a supervisor for purposes of the NLRA, Congress sought to distinguish "between straw bosses, leadmen, set-up men, and other minor supervisory employees, on the one hand, and the supervisor vested with such genuine management prerogatives as the

CFR §§9701.511(a)(2), (3) (2012) (referring to a supervisor's authority to "hire, assign, and direct employees . . . and [t]o lay off and retain employees, or to suspend, re-

———————

right to hire or fire, discipline, or make effective recommendations with respect to such action." S. Rep. No. 105, 80th Cong., 1st Sess., 4 (1947). Cf. *NLRB* v. *Health Care & Retirement Corp. of America*, 511 U. S. 571, 586 (1994) (*HCRA*) (GINSBURG, J., dissenting) ("Through case-by-case adjudication, the Board has sought to distinguish individuals exercising the level of control that truly places them in the ranks of management, from highly skilled employees, whether professional or technical, who perform, incidentally to their skilled work, a limited supervisory role"). Accordingly, the NLRB has interpreted the NLRA's statutory definition of supervisor more narrowly than its plain language might permit. See*, e.g., Connecticut Humane Society*, *supra*, at \*39 (an employee who evaluates others is not a supervisor unless the evaluation "affect[s] the wages and the job status of the employee evaluated"); *In re CGLM, Inc.*, 350 NLRB 974, 977 (2007) ("'If any authority over someone else, no matter how insignificant or infrequent, made an employee a supervisor, our industrial composite would be predominantly supervisory. Every order-giver is not a supervisor. Even the traffic director tells the president of the company where to park his car'" (quoting *NLRB* v. *Security Guard Serv., Inc.*, 384 F. 2d 143, 151 (CA5 1967))). The NLRA therefore does not define the term "supervisor" as broadly as petitioner suggests.

To be sure, the NLRA may in some instances define "supervisor" more broadly than we define the term in this case. But those differences reflect the NLRA's unique purpose, which is to preserve the balance of power between labor and management, see *HCRA*, *supra*, at 573 (explaining that Congress amended the NLRA to exclude supervisors in order to address the "imbalance between labor and management" that resulted when "supervisory employees could organize as part of bargaining units and negotiate with the employer"). That purpose is inapposite in the context of Title VII, which focuses on eradicating discrimination. An employee may have a sufficient degree of authority over subordinates such that Congress has decided that the employee should not participate with lower level employees in the same collective-bargaining unit (because, for example, a higher level employee will pursue his own interests at the expense of lower level employees' interests), but that authority is not necessarily sufficient to merit heightened liability for the purposes of Title VII. The NLRA's definition of supervisor therefore is not controlling in this context.

move, reduce in grade, band, or pay, or take other discipli-
nary action against such employees or, with respect to
filling positions, to make selections for appointments from
properly ranked and certified candidates for promotion or
from any other appropriate source"); §9701.212(b)(4) (de-
fining "supervisory work" as that which "may involve
hiring or selecting employees, assigning work, managing
performance, recognizing and rewarding employees, and
other associated duties").

In sum, the term "supervisor" has varying meanings
both in colloquial usage and in the law. And for this
reason, petitioner's argument, taken on its own terms, is
unsuccessful.

More important, petitioner is misguided in suggesting
that we should approach the question presented here as if
"supervisor" were a statutory term. "Supervisor" is not a
term used by Congress in Title VII. Rather, the term was
adopted by this Court in *Ellerth* and *Faragher* as a label
for the class of employees whose misconduct may give
rise to vicarious employer liability. Accordingly, the way
to understand the meaning of the term "supervisor" for
present purposes is to consider the interpretation that
best fits within the highly structured framework that
those cases adopted.

B

In considering *Ellerth* and *Faragher,* we are met at the
outset with petitioner's contention that at least some of
the alleged harassers in those cases, whom we treated as
supervisors, lacked the authority that the Seventh Cir-
cuit's definition demands. This argument misreads our
decisions.

In *Ellerth*, it was clear that the alleged harasser was a
supervisor under any definition of the term: He hired his
victim, and he promoted her (subject only to the minis-
terial approval of his supervisor, who merely signed the

paperwork). 524 U. S., at 747. *Ellerth* was a case from the Seventh Circuit, and at the time of its decision in that case, that court had already adopted its current definition of a supervisor. See *Volk* v. *Coler*, 845 F. 2d 1422, 1436 (1988). See also *Parkins* v. *Civil Constructors of Ill., Inc.*, 163 F. 3d 1027, 1033, n. 1 (CA7 1998) (discussing Circuit case law). Although the en banc Seventh Circuit in *Ellerth* issued eight separate opinions, there was no disagreement about the harasser's status as a supervisor. *Jansen* v. *Packaging Corp. of America*, 123 F. 3d 490 (1997) (*per curiam*). Likewise, when the case reached this Court, no question about the harasser's status was raised.

The same is true with respect to *Faragher*. In that case, Faragher, a female lifeguard, sued her employer, the city of Boca Raton, for sexual harassment based on the conduct of two other lifeguards, Bill Terry and David Silverman, and we held that the city was vicariously liable for Terry's and Silverman's harassment. Although it is clear that Terry had authority to take tangible employment actions affecting the victim,[8] see 524 U. S., at 781 (explaining that Terry could hire new lifeguards, supervise their work assignments, counsel, and discipline them), Silverman

---

[8] The dissent suggests that it is unclear whether Terry would qualify as a supervisor under the test we adopt because his hiring decisions were subject to approval by higher management. *Post,* at 7, n. 1 (opinion of GINSBURG, J.). See also *Faragher*, 524 U. S., at 781. But we have assumed that tangible employment actions can be subject to such approval. See *Ellerth*, 524 U. S., at 762. In any event, the record indicates that Terry possessed the power to make employment decisions having direct economic consequences for his victims. See Brief for Petitioner in *Faragher* v. *Boca Raton*, O. T. 1997, No. 97–282, p. 9 ("No one, during the twenty years that Terry was Marine Safety Chief, was hired without his recommendation. [He] initiated firing and suspending personnel. [His] evaluations of the lifeguards translated into salary increases. [He] made recommendations regarding promotions . . ." (citing record)).

may have wielded less authority, *ibid.* (noting that Silverman was "responsible for making the lifeguards' daily assignments, and for supervising their work and fitness training"). Nevertheless, the city never disputed Faragher's characterization of both men as her "supervisors." See App., O. T. 1997, No. 97–282, p. 40 (First Amended Complaint ¶¶6–7); *id.*, at 79 (Answer to First Amended Complaint ¶¶6–7) (admitting that both harassers had "supervisory responsibilities" over the plaintiff).[9]

In light of the parties' undisputed characterization of the alleged harassers, this Court simply was not presented with the question of the degree of authority that an employee must have in order to be classified as a supervisor.[10] The parties did not focus on the issue in their briefs, although the victim in *Faragher* appears to have agreed that supervisors are employees empowered to take tangible employment actions. See Brief for Petitioner, O. T.

_____

[9] Moreover, it is by no means certain that Silverman lacked the authority to take tangible employment actions against Faragher. In her merits brief, Faragher stated that, as a lieutenant, Silverman "made supervisory and disciplinary decisions and had input on the evaluations as well." *Id.,* at 9–10. If that discipline had economic consequences (such as suspension without pay), then Silverman might qualify as a supervisor under the definition we adopt today.

Silverman's ability to assign Faragher significantly different work responsibilities also may have constituted a tangible employment action. Silverman told Faragher, "'Date me or clean the toilets for a year.'" *Faragher*, *supra*, at 780. That threatened reassignment of duties likely would have constituted significantly different responsibilities for a lifeguard, whose job typically is to guard the beach. If that reassignment had economic consequences, such as foreclosing Faragher's eligibility for promotion, then it might constitute a tangible employment action.

[10] The lower court did not even address this issue. See *Faragher* v. *Boca Raton*, 111 F. 3d 1530, 1547 (CA11 1997) (Anderson, J., concurring in part and dissenting in part) (noting that it was unnecessary to "decide the threshold level of authority which a supervisor must possess in order to impose liability on the employer").

1997, No. 97–282, p. 24 ("Supervisors typically exercise broad discretionary powers over their subordinates, determining many of the terms and conditions of their employment, including their raises and prospects for promotion and controlling or greatly influencing whether they are to be dismissed").

For these reasons, we have no difficulty rejecting petitioner's argument that the question before us in the present case was effectively settled in her favor by our treatment of the alleged harassers in *Ellerth* and *Faragher*.[11]

The dissent acknowledges that our prior cases do "not squarely resolve whether an employee without power to take tangible employment actions may nonetheless qualify as a supervisor," but accuses us of ignoring the "all-too-plain reality" that employees with authority to control their subordinates' daily work are aided by that authority in perpetuating a discriminatory work environment. *Post,* at 8 (opinion of GINSBURG, J.). As *Ellerth* recognized, however, "most workplace tortfeasors are aided in accomplishing their tortious objective by the existence of the agency relation," and consequently "something more" is required in order to warrant vicarious liability. 524 U. S., at 760. The ability to direct another employee's tasks is

_____

[11] According to the dissent, the rule that we adopt is also inconsistent with our decision in *Pennsylvania State Police* v. *Suders*, 542 U. S. 129 (2004). See *post,* at 7–8. The question in that case was "whether a constructive discharge brought about by supervisor harassment ranks as a tangible employment action and therefore precludes assertion of the affirmative defense articulated in *Ellerth* and *Faragher*." *Suders, supra,* at 140. As the dissent implicitly acknowledges, the supervisor status of the harassing employees was not before us in that case. See *post,* at 8. Indeed, the employer conceded early in the litigation that the relevant employees were supervisors, App. in *Pennsylvania State Police* v. *Suders*, O. T. 2003, No. 03–95, p. 20 (Answer ¶29), and we therefore had no occasion to question that unchallenged characterization.

simply not sufficient.  Employees with such powers are certainly capable of creating intolerable work environments, see *post,* at 9–11 (discussing examples), but so are many other co-workers.  Negligence provides the better framework for evaluating an employer's liability when a harassing employee lacks the power to take tangible employment actions.

C

Although our holdings in *Faragher* and *Ellerth* do not resolve the question now before us, we believe that the answer to that question is implicit in the characteristics of the framework that we adopted.

To begin, there is no hint in either *Ellerth* or *Faragher* that the Court contemplated anything other than a unitary category of supervisors, namely, those possessing the authority to effect a tangible change in a victim's terms or conditions of employment.  The *Ellerth/Faragher* framework draws a sharp line between co-workers and supervisors.  Co-workers, the Court noted, "can inflict psychological injuries" by creating a hostile work environment, but they "cannot dock another's pay, nor can one co-worker demote another."  *Ellerth*, 524 U. S., at 762.  Only a supervisor has the power to cause "direct economic harm" by taking a tangible employment action.  *Ibid*.  "Tangible employment actions fall within the special province of the supervisor.  The supervisor has been empowered by the company *as a distinct class* of agent to make economic decisions affecting other employees under his or her control. . . . Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates."  *Ibid*. (emphasis added). The strong implication of this passage is that the authority to take tangible employment actions is the defining characteristic of a supervisor, not simply a characteristic of a subset of an ill-defined class of employees who qualify

as supervisors.

The way in which we framed the question presented in *Ellerth* supports this understanding. As noted, the *Ellerth/Faragher* framework sets out two circumstances in which an employer may be vicariously liable for a supervisor's harassment. The first situation (which results in strict liability) exists when a supervisor actually takes a tangible employment action based on, for example, a subordinate's refusal to accede to sexual demands. The second situation (which results in vicarious liability if the employer cannot make out the requisite affirmative defense) is present when no such tangible action is taken. Both *Ellerth* and *Faragher* fell into the second category, and in *Ellerth*, the Court couched the question at issue in the following terms: "whether an employer has vicarious liability when a supervisor creates a hostile work environment by making explicit threats to alter a subordinate's terms or conditions of employment, based on sex, but does not fulfill the threat." 524 U. S., at 754. This statement plainly ties the second situation to a supervisor's authority to inflict direct economic injury. It is because a supervisor has that authority—and its potential use hangs as a threat over the victim—that vicarious liability (subject to the affirmative defense) is justified.

Finally, the *Ellerth/Faragher* Court sought a framework that would be workable and would appropriately take into account the legitimate interests of employers and employees. The Court looked to principles of agency law for guidance, but the Court concluded that the "malleable terminology" of the aided-in-the-commission principle counseled against the wholesale incorporation of that principle into Title VII case law. *Ellerth*, 524 U. S., at 763. Instead, the Court also considered the objectives of Title VII, including "the limitation of employer liability in certain circumstances." *Id.*, at 764.

The interpretation of the concept of a supervisor that we

adopt today is one that can be readily applied.  In a great many cases, it will be known even before litigation is commenced whether an alleged harasser was a supervisor, and in others, the alleged harasser's status will become clear to both sides after discovery.  And once this is known, the parties will be in a position to assess the strength of a case and to explore the possibility of resolving the dispute.  Where this does not occur, supervisor status will generally be capable of resolution at summary judgment.  By contrast, under the approach advocated by petitioner and the EEOC, supervisor status would very often be murky—as this case well illustrates.[12]

According to petitioner, the record shows that Davis, her alleged harasser, wielded enough authority to qualify as a supervisor.  Petitioner points in particular to Davis' job description, which gave her leadership responsibilities, and to evidence that Davis at times led or directed Vance and other employees in the kitchen.  See Brief for Petitioner 42–43 (citing record); Reply Brief 22–23 (same).  The United States, on the other hand, while applying the same open-ended test for supervisory status, reaches the opposite conclusion.  At least on the present record, the United States tells us, Davis fails to qualify as a supervisor.  Her job description, in the Government's view, is not dispositive, and the Government adds that it would not be enough for petitioner to show that Davis "occasionally took the lead in the kitchen."  Brief for United States as *Amicus Curiae* 31 (U. S. Brief).

This disagreement is hardly surprising since the

_____

[12] The dissent attempts to find ambiguities in our holding, see *post,* at 15–16, and n. 5, but it is indisputable that our holding is orders of magnitude clearer than the nebulous standard it would adopt.  Employment discrimination cases present an almost unlimited number of factual variations, and marginal cases are inevitable under any standard.

EEOC's definition of a supervisor, which both petitioner and the United States defend, is a study in ambiguity. In its Enforcement Guidance, the EEOC takes the position that an employee, in order to be classified as a supervisor, must wield authority "'of sufficient magnitude so as to assist the harasser explicitly or implicitly in carrying out the harassment.'" *Id.,* at 27 (quoting App. to Pet. for Cert. 89a (EEOC Guidance)). But *any* authority over the work of another employee provides at least some assistance, see *Ellerth, supra,* at 763, and that is not what the United States interprets the Guidance to mean. Rather, it informs us, the authority must exceed both an ill-defined temporal requirement (it must be more than "occasiona[ll]") and an ill-defined substantive requirement ("an employee who directs 'only a limited number of tasks or assignments' for another employee . . . would not have sufficient authority to qualify as a supervisor." U. S. Brief 28 (quoting App. to Pet. for Cert. 92a (EEOC Guidance)); U. S. Brief 31.

We read the EEOC Guidance as saying that the number (and perhaps the importance) of the tasks in question is a factor to be considered in determining whether an employee qualifies as a supervisor. And if this is a correct interpretation of the EEOC's position, what we are left with is a proposed standard of remarkable ambiguity.

The vagueness of this standard was highlighted at oral argument when the attorney representing the United States was asked to apply that standard to the situation in *Faragher*, where the alleged harasser supposedly threatened to assign the plaintiff to clean the toilets in the lifeguard station for a year if she did not date him. 524 U. S., at 780. Since cleaning the toilets is just one task, albeit an unpleasant one, the authority to assign that job would not seem to meet the more-than-a-limited-number-of-tasks requirement in the EEOC Guidance. Nevertheless, the Government attorney's first response was that the author-

ity to make this assignment would be enough.  Tr. of Oral Arg. 23.  He later qualified that answer by saying that it would be necessary to "know how much of the day's work [was] encompassed by cleaning the toilets."  *Id.,* at 23–24. He did not explain what percentage of the day's work (50%, 25%, 10%?) would suffice.

The Government attorney's inability to provide a definitive answer to this question was the inevitable consequence of the vague standard that the Government asks us to adopt.  Key components of that standard— "sufficient" authority, authority to assign more than a "limited number of tasks," and authority that is exercised more than "occasionally"—have no clear meaning.  Applying these standards would present daunting problems for the lower federal courts and for juries.

Under the definition of "supervisor" that we adopt today, the question of supervisor status, when contested, can very often be resolved as a matter of law before trial.  The elimination of this issue from the trial will focus the efforts of the parties, who will be able to present their cases in a way that conforms to the framework that the jury will apply.  The plaintiff will know whether he or she must prove that the employer was negligent or whether the employer will have the burden of proving the elements of the *Ellerth/Faragher* affirmative defense.  Perhaps even more important, the work of the jury, which is inevitably complicated in employment discrimination cases, will be simplified.  The jurors can be given preliminary instructions that allow them to understand, as the evidence comes in, how each item of proof fits into the framework that they will ultimately be required to apply.  And even where the issue of supervisor status cannot be eliminated from the trial (because there are genuine factual disputes about an alleged harasser's authority to take tangible employment actions), this preliminary question is relatively straightforward.

Opinion of the Court

The alternative approach advocated by petitioner and the United States would make matters far more complicated and difficult. The complexity of the standard they favor would impede the resolution of the issue before trial. With the issue still open when trial commences, the parties would be compelled to present evidence and argument on supervisor status, the affirmative defense, and the question of negligence, and the jury would have to grapple with all those issues as well. In addition, it would often be necessary for the jury to be instructed about two very different paths of analysis, *i.e.*, what to do if the alleged harasser was found to be a supervisor and what to do if the alleged harasser was found to be merely a co-worker.

Courts and commentators alike have opined on the need for reasonably clear jury instructions in employment discrimination cases.[13] And the danger of juror confusion

———————

[13] See, *e.g., Gross* v. *FBL Financial Services, Inc.*, 557 U. S. 167, 179 (2009); *Armstrong* v. *Burdette Tomlin Memorial Hospital*, 438 F. 3d 240, 249 (CA3 2006) (noting in the context of *McDonnell Douglas Corp.* v. *Green,* 411 U. S. 792 (1973), that that "the 'prima facie case and the shifting burdens confuse lawyers and judges, much less juries, who do not have the benefit of extensive study of the law on the subject'" (quoting *Mogull* v. *Commercial Real Estate*, 162 N. J. 449, 471, 744 A. 2d 1186, 1199 (2000))); *Whittington* v. *Nordam Group Inc.*, 429 F. 3d 986, 998 (CA10 2005) (noting that unnecessarily complicated instructions complicate a jury's job in employment discrimination cases, and "unnecessary complexity increases the opportunity for error"); *Sanders* v. *New York City Human Resources Admin.*, 361 F. 3d 749, 758 (CA2 2004) ("Making the burden-shifting scheme of *McDonnell Douglas* part of a jury charge undoubtedly constitutes error because of the manifest risk of confusion it creates"); *Mogull, supra,* at 473, 744 A. 2d, at 1200 ("Given the confusion that often results when the first and second stages of the McDonnell Douglas test goes to the jury, we recommend that the court should decide both those issues"); Tymkovich, The Problem with Pretext, 85 Denver Univ. L. Rev. 503, 527–529 (2008) (discussing the potential for jury confusion that arises when instructions are unduly complex and proposing a simpler framework); Grebeldinger, Instructing the Jury in a Case of Circumstantial Individ-

is particularly high where the jury is faced with instruc-
tions on alternative theories of liability under which dif-
ferent parties bear the burden of proof.[14]  By simplifying
the process of determining who is a supervisor (and by
extension, which liability rules apply to a given set of
facts), the approach that we take will help to ensure that
juries return verdicts that reflect the application of the
correct legal rules to the facts.

  Contrary to the dissent's suggestions, see *post,* at 14, 17,
this approach will not leave employees unprotected
against harassment by co-workers who possess the author-
ity to inflict psychological injury by assigning unpleasant
tasks or by altering the work environment in objectionable
ways.  In such cases, the victims will be able to prevail
simply by showing that the employer was negligent in
permitting this harassment to occur, and the jury should
be instructed that the nature and degree of authority
wielded by the harasser is an important factor to be con-

————————

ual Disparate Treatment: Thoroughness or Simplicity? 12 Lab. Law.
399, 419 (1997) (concluding that more straightforward instructions
"provid[e] the jury with clearer guidance of their mission"); Davis, The
Stumbling Three-Step, Burden-Shifting Approach in Employment
Discrimination Cases, 61 Brook. L. Rev. 703, 742–743 (1995) (discuss-
ing potential for juror confusion in the face of complex instructions);
Note, Toward a Motivating Factor Test for Individual Disparate
Treatment Claims, 100 Mich. L. Rev. 234, 262–273 (2001) (discussing
the need for a simpler approach to jury instructions in employment
discrimination cases).

  [14] Cf. Struve, Shifting Burdens: Discrimination Law Through the
Lens of Jury Instructions, 51 Boston College L. Rev. 279, 330–334
(2010) (arguing that unnecessary confusion arises when a jury must
resolve different claims under different burden frameworks); Monahan,
*Cabrera v. Jakabovitz*—A Common-Sense Proposal for Formulating
Jury Instructions Regarding Shifting Burdens of Proof in Disparate
Treatment Discrimination Cases, 5 Geo. Mason U. C. R. L. J. 55, 76
(1994) ("Any jury instruction that attempts to shift the burden of per-
suasion on closely related issues is never likely to be successful").

sidered in determining whether the employer was negligent. The nature and degree of authority possessed by harassing employees varies greatly, see *post,* 9–11 (offering examples), and as we explained above, the test proposed by petitioner and the United States is ill equipped to deal with the variety of situations that will inevitably arise. This variety presents no problem for the negligence standard, which is thought to provide adequate protection for tort plaintiffs in many other situations. There is no reason why this standard, if accompanied by proper instructions, cannot provide the same service in the context at issue here.

## D

The dissent argues that the definition of a supervisor that we now adopt is out of touch with the realities of the workplace, where individuals with the power to assign daily tasks are often regarded by other employees as supervisors. See *post,* at 5, 8–12. But in reality it is the alternative that is out of touch. Particularly in modern organizations that have abandoned a highly hierarchical management structure, it is common for employees to have overlapping authority with respect to the assignment of work tasks. Members of a team may each have the responsibility for taking the lead with respect to a particular aspect of the work and thus may have the responsibility to direct each other in that area of responsibility.

Finally, petitioner argues that tying supervisor status to the authority to take tangible employment actions will encourage employers to attempt to insulate themselves from liability for workplace harassment by empowering only a handful of individuals to take tangible employment actions. But a broad definition of "supervisor" is not necessary to guard against this concern.

As an initial matter, an employer will always be liable when its negligence leads to the creation or continuation of

a hostile work environment. And even if an employer concentrates all decisionmaking authority in a few individuals, it likely will not isolate itself from heightened liability under *Faragher* and *Ellerth*. If an employer does attempt to confine decisionmaking power to a small number of individuals, those individuals will have a limited ability to exercise independent discretion when making decisions and will likely rely on other workers who actually interact with the affected employee. Cf. *Rhodes* v. *Illinois Dept. of Transp.*, 359 F. 3d 498, 509 (CA7 2004) (Rovner, J., concurring in part and concurring in judgment) ("Although they did not have the power to take formal employment actions vis-à-vis [the victim], [the harassers] necessarily must have had substantial input into those decisions, as they would have been the people most familiar with her work—certainly more familiar with it than the off-site Department Administrative Services Manager"). Under those circumstances, the employer may be held to have effectively delegated the power to take tangible employment actions to the employees on whose recommendations it relies. See *Ellerth*, 524 U. S., at 762.

IV

Importuning Congress, *post,* at 21–22, the dissent suggests that the standard we adopt today would cause the plaintiffs to lose in a handful of cases involving shocking allegations of harassment, see *post,* at 9–12. However, the dissent does not mention *why* the plaintiffs would lose in those cases. It is not clear in any of those examples that the legal outcome hinges on the definition of "supervisor." For example, Clara Whitten ultimately did not prevail on her discrimination claims—notwithstanding the fact that the Fourth Circuit adopted the approach advocated by the dissent, see *Whitten* v. *Fred's, Inc.*, 601 F. 3d 231, 243–247 (2010)—because the District Court subsequently dismissed her claims for lack of jurisdiction. See

*Whitten* v. *Fred's, Inc.*, No. 8:08–0218–HMH–BHH, 2010 WL 2757005, \*3 (D SC, July 12, 2010). And although the dissent suggests that Donna Rhodes' employer would have been liable under the dissent's definition of "supervisor," that is pure speculation: It is not clear that Rhodes suffered any tangible employment action, see *Rhodes* v. *Illinois Dept. of Transp.*, 243 F. Supp. 2d 810, 817 (ND Ill. 2003), and no court had occasion to determine whether the employer could have established the affirmative defense (a prospect that is certainly feasible given that there was evidence that the employer had an "adequate anti-harassment policy in place," that the employer promptly addressed the incidents about which Rhodes complained, and that "Rhodes failed to take advantage of the preventative or corrective opportunities provided," *Rhodes* v. *Illinois Dept. of Transp.*, 359 F. 3d, at 507).[15] Finally, the dissent's reliance on Monika Starke's case is perplexing given that the EEOC ultimately *did* obtain relief (in the amount of $50,000) for the harassment of Starke,[16] see Order of Dismissal in No. 1:07–cv–0095–LRR (ND Iowa,

---

[15] Similarly, it is unclear whether Yasharay Mack ultimately would have prevailed even under the dissent's definition of "supervisor." The Second Circuit (adopting a definition similar to that advocated by the dissent) remanded the case for the District Court to determine whether Mack "'unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise.'" *Mack* v. *Otis Elevator Co.*, 326 F. 3d 116, 127–128 (2003) (quoting *Ellerth*, 524 U. S., at 765). But before it had an opportunity to make any such determination, Mack withdrew her complaint and the District Court dismissed her claims with prejudice. See Stipulation and Order of Dismissal in No. 1:00–cv–7778–LAP (SDNY, Oct. 21, 2004), Dkt. No. 63.

[16] Starke herself lacked standing to pursue her claims, see *EEOC* v. *CRST Van Expedited, Inc.,* 679 F. 3d 657, 678, and n. 14 (CA8 2012), but the Eighth Circuit held that the EEOC could sue in its own name to remedy the sexual harassment against Starke and other CRST employees, see *id.,* at 682.

Feb. 2, 2013), Dkt. No. 380, Exh. 1, ¶1, notwithstanding the fact that the court in that case applied the definition of "supervisor" that we adopt today, see *EEOC* v. *CRST Van Expedited, Inc.*, 679 F. 3d 657, 684 (CA8 2012).

In any event, the dissent is wrong in claiming that our holding would preclude employer liability in other cases with facts similar to these. Assuming that a harasser is not a supervisor, a plaintiff could still prevail by showing that his or her employer was negligent in failing to prevent harassment from taking place. Evidence that an employer did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints from being filed would be relevant. Thus, it is not true, as the dissent asserts, that our holding "relieves scores of employers of responsibility" for the behavior of workers they employ. *Post,* at 14.

The standard we adopt is not untested. It has been the law for quite some time in the First, Seventh, and Eighth Circuits, see, *e.g., Noviello* v. *Boston*, 398 F. 3d 76, 96 (CA1 2005); *Weyers* v. *Lear Operations Corp.*, 359 F. 3d 1049, 1057 (CA8 2004); *Parkins* v. *Civil Constructors of Ill., Inc.*, 163 F. 3d 1027, 1033–1034, and n. 1 (CA7 1998)—*i.e.,* in Arkansas, Illinois, Indiana, Iowa, Maine, Massachusetts, Minnesota, Missouri, Nebraska, New Hampshire, North Dakota, Rhode Island, South Dakota, and Wisconsin. We are aware of no evidence that this rule has produced dire consequences in these 14 jurisdictions.

Despite its rhetoric, the dissent acknowledges that Davis, the alleged harasser in this case, would probably not qualify as a supervisor even under the dissent's preferred approach. See *post,* at 20 ("[T]here is cause to anticipate that Davis would not qualify as Vance's supervisor"). On that point, we agree. Petitioner did refer to Davis as a "supervisor" in some of the complaints that she filed, App. 28; *id.*, at 45, and Davis' job description does

state that she supervises Kitchen Assistants and Substitutes and "[l]ead[s] and direct[s]" certain other employees, *id.*, at 12–13. But under the dissent's preferred approach, supervisor status hinges not on formal job titles or "paper descriptions" but on "specific facts about the working relationship." *Post,* at 20–21 (internal quotation marks omitted).

Turning to the "specific facts" of petitioner's and Davis' working relationship, there is simply no evidence that Davis directed petitioner's day-to-day activities. The record indicates that Bill Kimes (the general manager of the Catering Division) and the chef assigned petitioner's daily tasks, which were given to her on "prep lists." No. 1:06–cv–1452–SEB–JMS, 2008 WL 4247836, *7 (SD Ind., Sept. 10, 2008); App. 430, 431. The fact that Davis sometimes may have handed prep lists to petitioner, see *id.,* at 74, is insufficient to confer supervisor status, see App. to Pet. for Cert. 92a (EEOC Guidance). And Kimes—*not* Davis—set petitioner's work schedule. See App. 431. See also *id.,* at 212.

Because the dissent concedes that our approach in this case deprives petitioner of none of the protections that Title VII offers, the dissent's critique is based on nothing more than a hypothesis as to how our approach might affect the outcomes of *other* cases—cases where an employee who cannot take tangible employment actions, but who does direct the victim's daily work activities in a meaningful way, creates an unlawful hostile environment, and yet does not wield authority of such a degree and nature that the employer can be deemed negligent with respect to the harassment. We are skeptical that there are a great number of such cases. However, we are confident that, in every case, the approach we take today will be more easily administrable than the approach advocated by the dissent.

\*   \*   \*

We hold that an employee is a "supervisor" for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim. Because there is no evidence that BSU empowered Davis to take any tangible employment actions against Vance, the judgment of the Seventh Circuit is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

<hr>

No. 11–556

<hr>

## MAETTA VANCE, PETITIONER *v.* BALL STATE UNIVERSITY

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[June 24, 2013]

JUSTICE THOMAS, concurring.

I continue to believe that *Burlington Industries, Inc.* v. *Ellerth*, 524 U. S. 742 (1998), and *Faragher* v. *Boca Raton*, 524 U. S. 775 (1998), were wrongly decided. See *ante,* at 8. However, I join the opinion because it provides the narrowest and most workable rule for when an employer may be held vicariously liable for an employee's harassment.

# SUPREME COURT OF THE UNITED STATES

_____

No. 11–556

_____

## MAETTA VANCE, PETITIONER *v.* BALL STATE UNIVERSITY

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[June 24, 2013]

JUSTICE GINSBURG, with whom JUSTICE BREYER, JUSTICE SOTOMAYOR, and JUSTICE KAGAN join, dissenting.

In *Faragher* v. *Boca Raton*, 524 U. S. 775 (1998), and *Burlington Industries, Inc.* v. *Ellerth*, 524 U. S. 742 (1998), this Court held that an employer can be vicariously liable under Title VII of the Civil Rights Act of 1964 for harassment by an employee given supervisory authority over subordinates. In line with those decisions, in 1999, the Equal Employment Opportunity Commission (EEOC) provided enforcement guidance "regarding employer liability for harassment by supervisors based on sex, race, color, religion, national origin, age, disability, or protected activity." EEOC, Guidance on Vicarious Employer Liability For Unlawful Harassment by Supervisors, 8 BNA FEP Manual 405:7651 (Feb. 2003) (hereinafter EEOC Guidance). Addressing who qualifies as a supervisor, the EEOC answered: (1) an individual authorized "to undertake or recommend tangible employment decisions affecting the employee," including "hiring, firing, promoting, demoting, and reassigning the employee"; *or* (2) an individual authorized "to direct the employee's daily work activities." *Id.*, at 405:7654.

The Court today strikes from the supervisory category employees who control the day-to-day schedules and assignments of others, confining the category to those for-

mally empowered to take tangible employment actions. The limitation the Court decrees diminishes the force of *Faragher* and *Ellerth*, ignores the conditions under which members of the work force labor, and disserves the objective of Title VII to prevent discrimination from infecting the Nation's workplaces. I would follow the EEOC's Guidance and hold that the authority to direct an employee's daily activities establishes supervisory status under Title VII.

## I
## A

Title VII makes it "an unlawful employment practice for an employer" to "discriminate against any individual with respect to" the "terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U. S. C. §2000e–2(a). The creation of a hostile work environment through harassment, this Court has long recognized, is a form of proscribed discrimination. *Oncale* v. *Sundowner Offshore Services, Inc.*, 523 U. S. 75, 78 (1998); *Meritor Savings Bank, FSB* v. *Vinson*, 477 U. S. 57, 64–65 (1986).

What qualifies as harassment? Title VII imposes no "general civility code." *Oncale*, 523 U. S., at 81. It does not reach "the ordinary tribulations of the workplace," for example, "sporadic use of abusive language" or generally boorish conduct. B. Lindemann & D. Kadue, Sexual Harassment in Employment Law 175 (1992). See also 1 B. Lindemann & P. Grossman, Employment Discrimination Law 1335–1343 (4th ed. 2007) (hereinafter Lindemann & Grossman). To be actionable, charged behavior need not drive the victim from her job, but it must be of such severity or pervasiveness as to pollute the working environment, thereby "alter[ing] the conditions of the victim's employment." *Harris* v. *Forklift Systems, Inc.*, 510 U. S. 17, 21–22 (1993).

In *Faragher* and *Ellerth*, this Court established a framework for determining when an employer may be held liable for its employees' creation of a hostile work environment. Recognizing that Title VII's definition of "employer" includes an employer's "agent[s]," 42 U. S. C. §2000e(b), the Court looked to agency law for guidance in formulating liability standards. *Faragher*, 524 U. S., at 791, 801; *Ellerth*, 524 U. S., at 755–760. In particular, the Court drew upon §219(2)(d) of the Restatement (Second) of Agency (1957), which makes an employer liable for the conduct of an employee, even when that employee acts beyond the scope of her employment, if the employee is "aided in accomplishing" a tort "by the existence of the agency relation." See *Faragher*, 524 U. S., at 801; *Ellerth*, 524 U. S., at 758.

Stemming from that guide, *Faragher* and *Ellerth* distinguished between harassment perpetrated by supervisors, which is often enabled by the supervisor's agency relationship with the employer, and harassment perpetrated by co-workers, which is not similarly facilitated. *Faragher*, 524 U. S., at 801–803; *Ellerth*, 524 U. S., at 763–765. If the harassing employee is a supervisor, the Court held, the employer is vicariously liable whenever the harassment culminates in a tangible employment action. *Faragher*, 524 U. S., at 807–808; *Ellerth*, 524 U. S., at 764–765. The term "tangible employment action," *Ellerth* observed, "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.*, at 761. Such an action, the Court explained, provides "assurance the injury could not have been inflicted absent the agency relation." *Id.*, at 761–762.

An employer may also be held vicariously liable for a supervisor's harassment that does *not* culminate in a tangible employment action, the Court next determined.

In such a case, however, the employer may avoid liability by showing that (1) it exercised reasonable care to prevent and promptly correct harassing behavior, and (2) the complainant unreasonably failed to take advantage of preventative or corrective measures made available to her. *Faragher*, 524 U. S., at 807; *Ellerth*, 524 U. S., at 765. The employer bears the burden of establishing this affirmative defense by a preponderance of the evidence. *Faragher*, 524 U. S., at 807; *Ellerth*, 524 U. S., at 765.

In contrast, if the harassing employee is a co-worker, a negligence standard applies. To satisfy that standard, the complainant must show that the employer knew or should have known of the offensive conduct but failed to take appropriate corrective action. See *Faragher*, 524 U. S., at 799; *Ellerth*, 524 U. S., at 758–759. See also 29 CFR §1604.11(d) (2012); EEOC Guidance 405:7652.

B

The distinction *Faragher* and *Ellerth* drew between supervisors and co-workers corresponds to the realities of the workplace. Exposed to a fellow employee's harassment, one can walk away or tell the offender to "buzz off." A supervisor's slings and arrows, however, are not so easily avoided. An employee who confronts her harassing supervisor risks, for example, receiving an undesirable or unsafe work assignment or an unwanted transfer. She may be saddled with an excessive workload or with placement on a shift spanning hours disruptive of her family life. And she may be demoted or fired. Facing such dangers, she may be reluctant to blow the whistle on her superior, whose "power and authority invests his or her harassing conduct with a particular threatening character." *Ellerth*, 524 U. S., at 763. See also *Faragher*, 524 U. S., at 803; Brief for Respondent 23 ("The potential threat to one's livelihood or working conditions will make the victim think twice before resisting harassment or

fighting back."). In short, as *Faragher* and *Ellerth* recognized, harassment by supervisors is more likely to cause palpable harm and to persist unabated than similar conduct by fellow employees.

## II

While *Faragher* and *Ellerth* differentiated harassment by supervisors from harassment by co-workers, neither decision gave a definitive answer to the question: Who qualifies as a supervisor? Two views have emerged. One view, in line with the EEOC's Guidance, counts as a supervisor anyone with authority to take tangible employment actions or to direct an employee's daily work activities. *E.g.*, *Mack* v. *Otis Elevator Co.*, 326 F. 3d 116, 127 (CA2 2003); *Whitten* v. *Fred's, Inc.*, 601 F. 3d 231, 246 (CA4 2010); EEOC Guidance 405:7654. The other view ranks as supervisors only those authorized to take tangible employment actions. *E.g., Noviello* v. *Boston*, 398 F. 3d 76, 96 (CA1 2005); *Parkins* v. *Civil Constructors of Ill., Inc.*, 163 F. 3d 1027, 1034 (CA7 1998); *Joens* v. *John Morrell & Co.*, 354 F. 3d 938, 940–941 (CA8 2004).

Notably, respondent Ball State University agreed with petitioner Vance and the United States, as *amicus curiae*, that the tangible-employment-action-only test "does not necessarily capture all employees who may qualify as supervisors." Brief for Respondent 1. "[V]icarious liability," Ball State acknowledged, "also may be triggered when the harassing employee has the authority to control the victim's daily work activities in a way that materially enables the harassment." *Id.,* at 1–2.

The different view taken by the Court today is out of accord with the agency principles that, *Faragher* and *Ellerth* affirmed, govern Title VII. See *supra,* at 3–4. It is blind to the realities of the workplace, and it discounts the guidance of the EEOC, the agency Congress established to interpret, and superintend the enforcement of, Title VII.

Under that guidance, the appropriate question is: Has the employer given the alleged harasser authority to take tangible employment actions *or* to control the conditions under which subordinates do their daily work? If the answer to either inquiry is yes, vicarious liability is in order, for the superior-subordinate working arrangement facilitating the harassment is of the employer's making.

### A

Until today, our decisions have assumed that employees who direct subordinates' daily work are supervisors. In *Faragher*, the city of Boca Raton, Florida, employed Bill Terry and David Silverman to oversee the city's corps of ocean lifeguards. 524 U. S., at 780. Terry and Silverman "repeatedly subject[ed] Faragher and other female lifeguards to uninvited and offensive touching," and they regularly "ma[de] lewd remarks, and [spoke] of women in offensive terms." *Ibid.* (internal quotation marks omitted). Terry told a job applicant that "female lifeguards had sex with their male counterparts," and then "asked whether she would do the same." *Id.*, at 782. Silverman threatened to assign Faragher to toilet-cleaning duties for a year if she refused to date him. *Id.*, at 780. In words and conduct, Silverman and Terry made the beach a hostile place for women to work.

As Chief of Boca Raton's Marine Safety Division, Terry had authority to "hire new lifeguards (subject to the approval of higher management), to supervise all aspects of the lifeguards' work assignments, to engage in counseling, to deliver oral reprimands, and to make a record of any such discipline." *Id.,* at 781. Silverman's duties as a Marine Safety lieutenant included "making the lifeguards' daily assignments, and . . . supervising their work and fitness training." *Ibid.* Both men "were granted virtually unchecked authority over their subordinates, directly controlling and supervising all aspects of Faragher's day-

to-day activities." *Id.*, at 808 (internal quotation marks and brackets omitted).

We may assume that Terry would fall within the definition of supervisor the Court adopts today. See *ante*, at 9.[1] But nothing in the *Faragher* record shows that Silverman would. Silverman had oversight and assignment responsibilities—he could punish lifeguards who would not date him with full-time toilet-cleaning duty—but there was no evidence that he had authority to take tangible employment actions. See *Faragher*, 524 U. S., at 780–781. Holding that Boca Raton was vicariously liable for Silverman's harassment, *id.,* at 808–809, the Court characterized him as Faragher's supervisor, see *id.*, at 780, and there was no dissent on that point, see *id.,* at 810 (THOMAS, J., dissenting).

Subsequent decisions reinforced *Faragher*'s use of the term "supervisor" to encompass employees with authority to direct the daily work of their victims. In *Pennsylvania State Police* v. *Suders*, 542 U. S. 129, 140 (2004), for example, the Court considered whether a constructive discharge occasioned by supervisor harassment ranks as a tangible employment action. The harassing employees lacked authority to discharge or demote the complainant,

---

[1] It is not altogether evident that Terry would qualify under the Court's test. His authority to hire was subject to approval by higher management, *Faragher* v. *Boca Raton,* 524 U. S. 775, 781 (1998), and there is scant indication that he possessed other powers on the Court's list. The Court observes that Terry was able to "recommen[d]," and "initiat[e]" tangible employment actions. *Ante*, at 15, n. 8 (internal quotation marks omitted). Nothing in the *Faragher* record, however, shows that Terry had authority to take such actions himself. Faragher's complaint alleged that Terry said he would never promote a female lifeguard to the rank of lieutenant, 524 U. S., at 780, but that statement hardly suffices to establish that he had ultimate promotional authority. Had Boca Raton anticipated the position the Court today announces, the city might have urged classification of Terry as Faragher's superior, but not her "supervisor."

but they were "responsible for the day-to-day supervision" of the workplace and for overseeing employee shifts. *Suders* v. *Easton*, 325 F. 3d 432, 450, n. 11 (CA3 2003). Describing the harassing employees as the complainant's "supervisors," the Court proceeded to evaluate the complainant's constructive discharge claim under the *Ellerth* and *Faragher* framework. *Suders*, 542 U. S., at 134, 140–141.

It is true, as the Court says, *ante*, at 15–17, and n. 11, that *Faragher* and later cases did not squarely resolve whether an employee without power to take tangible employment actions may nonetheless qualify as a supervisor. But in laboring to establish that Silverman's supervisor status, undisputed in *Faragher*, is not dispositive here, the Court misses the forest for the trees. *Faragher* illustrates an all-too-plain reality: A supervisor with authority to control subordinates' daily work is no less aided in his harassment than is a supervisor with authority to fire, demote, or transfer. That Silverman could threaten Faragher with toilet-cleaning duties while Terry could orally reprimand her was inconsequential in *Faragher*, and properly so. What mattered was that both men took advantage of the power vested in them as agents of Boca Raton to facilitate their abuse. See *Faragher*, 524 U. S., at 801 (Silverman and Terry "implicitly threaten[ed] to misuse their supervisory powers to deter any resistance or complaint."). And when, assisted by an agency relationship, in-charge superiors like Silverman perpetuate a discriminatory work environment, our decisions have appropriately held the employer vicariously liable, subject to the above-described affirmative defense. See *supra,* at 3–4.

### B

Workplace realities fortify my conclusion that harassment by an employee with power to direct subordinates'

day-to-day work activities should trigger vicarious employer liability. The following illustrations, none of them hypothetical, involve in-charge employees of the kind the Court today excludes from supervisory status.[2]

*Yasharay Mack*: Yasharay Mack, an African-American woman, worked for the Otis Elevator Company as an elevator mechanic's helper at the Metropolitan Life Building in New York City. James Connolly, the "mechanic in charge" and the senior employee at the site, targeted Mack for abuse. He commented frequently on her "fantastic ass," "luscious lips," and "beautiful eyes," and, using deplorable racial epithets, opined that minorities and women did not "belong in the business." Once, he pulled her on his lap, touched her buttocks, and tried to kiss her while others looked on. Connolly lacked authority to take tangible employment actions against mechanic's helpers, but he did assign their work, control their schedules, and direct the particulars of their workdays. When he became angry with Mack, for example, he denied her overtime hours. And when she complained about the mistreatment, he scoffed, "I get away with everything." See *Mack*, 326 F. 3d, at 120–121, 125–126 (internal quotation marks omitted).

*Donna Rhodes*: Donna Rhodes, a seasonal highway maintainer for the Illinois Department of Transportation, was responsible for plowing snow during winter months. Michael Poladian was a "Lead Lead Worker" and Matt Mara, a "Technician" at the maintenance yard where Rhodes worked. Both men assembled plow crews and managed the work assignments of employees in Rhodes's position, but neither had authority to hire, fire, promote,

---

[2] The illustrative cases reached the appellate level after grants of summary judgment in favor of the employer. Like the Courts of Appeals in each case, I recount the facts in the light most favorable to the employee, the nonmoving party.

demote, transfer, or discipline employees. In her third season working at the yard, Rhodes was verbally assaulted with sex-based invectives and a pornographic image was taped to her locker. Poladian forced her to wash her truck in sub-zero temperatures, assigned her undesirable yard work instead of road crew work, and prohibited another employee from fixing the malfunctioning heating system in her truck. Conceding that Rhodes had been subjected to a sex-based hostile work environment, the Department of Transportation argued successfully in the District Court and Court of Appeals that Poladian and Mara were not Rhodes's supervisors because they lacked authority to take tangible employment actions against her. See *Rhodes* v. *Illinois Dept. of Transp.*, 359 F. 3d 498, 501–503, 506–507 (CA7 2004).

*Clara Whitten*: Clara Whitten worked at a discount retail store in Belton, South Carolina. On Whitten's first day of work, the manager, Matt Green, told her to "give [him] what [he] want[ed]" in order to obtain approval for long weekends off from work. Later, fearing what might transpire, Whitten ignored Green's order to join him in an isolated storeroom. Angered, Green instructed Whitten to stay late and clean the store. He demanded that she work over the weekend despite her scheduled day off. Dismissing her as "dumb and stupid," Green threatened to make her life a "living hell." Green lacked authority to fire, promote, demote, or otherwise make decisions affecting Whitten's pocketbook. But he directed her activities, gave her tasks to accomplish, burdened her with undesirable work assignments, and controlled her schedule. He was usually the highest ranking employee in the store, and both Whitten and Green considered him the supervisor. See *Whitten*, 601 F. 3d, at 236, 244–247 (internal quotation marks omitted).

*Monika Starke*: CRST Van Expedited, Inc., an interstate transit company, ran a training program for newly hired

truckdrivers requiring a 28-day on-the-road trip. Monika Starke participated in the program. Trainees like Starke were paired in a truck cabin with a single "lead driver" who lacked authority to hire, fire, promote, or demote, but who exercised control over the work environment for the duration of the trip. Lead drivers were responsible for providing instruction on CRST's driving method, assigning specific tasks, and scheduling rest stops. At the end of the trip, lead drivers evaluated trainees' performance with a nonbinding pass or fail recommendation that could lead to full driver status. Over the course of Starke's training trip, her first lead driver, Bob Smith, filled the cabin with vulgar sexual remarks, commenting on her breast size and comparing the gear stick to genitalia. A second lead driver, David Goodman, later forced her into unwanted sex with him, an outrage to which she submitted, believing it necessary to gain a passing grade. See *EEOC* v. *CRST Van Expedited, Inc.*, 679 F. 3d 657, 665–666, 684–685 (CA8 2012).

In each of these cases, a person vested with authority to control the conditions of a subordinate's daily work life used his position to aid his harassment. But in none of them would the Court's severely confined definition of supervisor yield vicarious liability for the employer. The senior elevator mechanic in charge, the Court today tells us, was Mack's co-worker, not her supervisor. So was the store manager who punished Whitten with long hours for refusing to give him what he wanted. So were the lead drivers who controlled all aspects of Starke's working environment, and the yard worker who kept other employees from helping Rhodes to control the heat in her truck.

As anyone with work experience would immediately grasp, James Connolly, Michael Poladian, Matt Mara, Matt Green, Bob Smith, and David Goodman wielded employer-conferred supervisory authority over their victims. Each man's discriminatory harassment derived

force from, and was facilitated by, the control reins he
held. Cf. *Burlington N. & S. F. R. Co.* v. *White*, 548 U. S.
53, 70–71 (2006) ("Common sense suggests that one good
way to discourage an employee . . . from bringing discrim-
ination charges would be to insist that she spend more
time performing the more arduous duties and less time
performing those that are easier or more agreeable."). 
Under any fair reading of Title VII, in each of the illustra-
tive cases, the superior employee should have been classi-
fied a supervisor whose conduct would trigger vicarious
liability.[3]

C

Within a year after the Court's decisions in *Faragher*
and *Ellerth*, the EEOC defined "supervisor" to include any
employee with "authority to undertake or recommend
tangible employment decisions," *or* with "authority to di-
rect [another] employee's daily work activities."  EEOC
Guidance 405:7654.  That definition should garner "re-
spect proportional to its 'power to persuade.'"  *United
States* v. *Mead Corp.*, 533 U. S. 218, 235 (2001) (quoting
*Skidmore* v. *Swift & Co.*, 323 U. S. 134, 140 (1944)).  See
also *Crawford* v. *Metropolitan Government of Nashville*

---

[3] The Court misses the point of the illustrations.  See *ante*, at 26–28,
and nn. 15–16.  Even under a vicarious liability rule, the Court points
out, employers might escape liability for reasons other than the har-
asser's status as supervisor.  For example, Rhodes might have avoided
summary judgment in favor of her employer; even so, it would have
been open to the employer to raise and prove to a jury the *Faragher/
Ellerth* affirmative defense, see *supra*, at 3–4.  No doubt other bar-
riers also might impede an employee from prevailing, for example,
Whitten's and Starke's intervening bankruptcies, see *Whitten* v. *Fred's
Inc.*, No. 8:08–0218–HMH–BHH, 2010 WL 2757005 (D. SC, July 12,
2010); *EEOC* v. *CRST Van Expedited, Inc.,* 679 F. 3d 657, 678, and
n. 14 (CA8 2012), or Mack's withdrawal of her complaint for reasons not
apparent from the record, see *ante*, at 27–28, n. 16.  That, however, is
no reason to restrict the definition of supervisor in a way that leaves
out those genuinely in charge.

*and Davidson Cty.*, 555 U. S. 271, 276 (2009) (EEOC guidelines merited *Skidmore* deference); *Federal Express Corp.* v. *Holowecki*, 552 U. S. 389, 399–403 (2008) (same); *Meritor*, 477 U. S., at 65 (same).[4]

The EEOC's definition of supervisor reflects the agency's "informed judgment" and "body of experience" in enforcing Title VII. *Id.,* at 65 (internal quotation marks omitted). For 14 years, in enforcement actions and litigation, the EEOC has firmly adhered to its definition. See Brief for United States as *Amicus Curiae* 28 (citing numerous briefs in the Courts of Appeals setting forth the EEOC's understanding).

In developing its definition of supervisor, the EEOC paid close attention to the *Faragher* and *Ellerth* framework. An employer is vicariously liable only when the authority it has delegated enables actionable harassment, the EEOC recognized. EEOC Guidance 405:7654. For that reason, a supervisor's authority must be "of a sufficient magnitude so as to assist the harasser . . . in carrying out the harassment." *Ibid.* Determining whether an employee wields sufficient authority is not a mechanical inquiry, the EEOC explained; instead, specific facts about the employee's job function are critical. *Id.,* at 405:7653 to 405:7654. Thus, an employee with authority to increase another's workload or assign undesirable tasks may rank as a supervisor, for those powers can enable harassment. *Id.,* at 405:7654. On the other hand, an employee "who directs only a limited number of tasks or assignments"

———————

[4] Respondent's *amici* maintain that the EEOC Guidance is ineligible for deference under *Skidmore* v. *Swift & Co.*, 323 U. S. 134 (1944), because it interprets *Faragher* and *Burlington Industries, Inc.* v. *Ellerth*, 524 U. S. 742 (1998), not the text of Title VII. See Brief for Society for Human Resource Management et al. 11–16. They are mistaken. The EEOC Guidance rests on the employer liability framework set forth in *Faragher* and *Ellerth*, but both the framework and EEOC Guidance construe the term "agent" in 42 U. S. C. §2000e(b).

ordinarily would not qualify as a supervisor, for her har-
assing conduct is not likely to be aided materially by the
agency relationship. *Id.,* at 405:7655.

In my view, the EEOC's definition, which the Court puts
down as "a study in ambiguity," *ante*, at 21, has the ring of
truth and, therefore, powerfully persuasive force. As a
precondition to vicarious employer liability, the EEOC
explained, the harassing supervisor must wield authority
of sufficient magnitude to enable the harassment. In
other words, the aided-in-accomplishment standard re-
quires "something more than the employment relation
itself." *Ellerth*, 524 U. S., at 760. Furthermore, as the
EEOC perceived, in assessing an employee's qualification
as a supervisor, context is often key. See *infra*, at 16–17.
I would accord the agency's judgment due respect.

## III

Exhibiting remarkable resistance to the thrust of our
prior decisions, workplace realities, and the EEOC's Guid-
ance, the Court embraces a position that relieves scores of
employers of responsibility for the behavior of the supervi-
sors they employ. Trumpeting the virtues of simplicity
and administrability, the Court restricts supervisor status
to those with power to take tangible employment actions.
In so restricting the definition of supervisor, the Court
once again shuts from sight the "robust protection against
workplace discrimination Congress intended Title VII to
secure." *Ledbetter* v. *Goodyear Tire & Rubber Co.*, 550
U. S. 618, 660 (2007) (GINSBURG, J., dissenting).

## A

The Court purports to rely on the *Ellerth* and *Faragher*
framework to limit supervisor status to those capable of
taking tangible employment actions. *Ante*, at 10, 18. That
framework, we are told, presupposes "a sharp line between
co-workers and supervisors." *Ante*, at 18. The definition

of supervisor decreed today, the Court insists, is "clear," "readily applied," and "easily workable," *ante*, at 10, 20, when compared to the EEOC's vague standard, *ante*, at 22.

There is reason to doubt just how "clear" and "workable" the Court's definition is. A supervisor, the Court holds, is someone empowered to "take tangible employment actions against the victim, *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Ante*, at 9 (quoting *Ellerth*, 524 U. S., at 761). Whether reassignment authority makes someone a supervisor might depend on whether the reassignment carries economic consequences. *Ante*, at 16, n. 9. The power to discipline other employees, when the discipline has economic consequences, might count, too. *Ibid.* So might the power to initiate or make recommendations about tangible employment actions. *Ante*, at 15, n. 8. And when an employer "concentrates all decisionmaking authority in a few individuals" who rely on information from "other workers who actually interact with the affected employee," the other workers may rank as supervisors (or maybe not; the Court does not commit one way or the other). *Ante*, at 26.

Someone in search of a bright line might well ask, what counts as "significantly different responsibilities"? Can *any* economic consequence make a reassignment or disciplinary action "significant," or is there a minimum threshold? How concentrated must the decisionmaking authority be to deem those not formally endowed with that authority nevertheless "supervisors"? The Court leaves these questions unanswered, and its liberal use of "mights" and "mays," *ante*, at 15, n. 8, 16, n. 9, 26, dims

the light it casts.[5]

That the Court has adopted a standard, rather than a clear rule, is not surprising, for no crisp definition of supervisor could supply the unwavering line the Court desires. Supervisors, like the workplaces they manage, come in all shapes and sizes. Whether a pitching coach supervises his pitchers (can he demote them?), or an artistic director supervises her opera star (can she impose significantly different responsibilities?), or a law firm associate supervises the firm's paralegals (can she fire them?) are matters not susceptible to mechanical rules and on-off switches. One cannot know whether an employer has vested supervisory authority in an employee, and whether harassment is aided by that authority, without looking to the particular working relationship between the harasser and the victim. That is why *Faragher* and *Ellerth* crafted an employer liability standard embracive of all whose authority significantly aids in the creation and perpetuation of harassment.

The Court's focus on finding a definition of supervisor capable of instant application is at odds with the Court's ordinary emphasis on the importance of particular circumstances in Title VII cases. See, *e.g.*, *Burlington Northern*, 548 U. S., at 69 ("[T]he significance of any given act of retaliation will often depend upon the particular circumstances."); *Harris*, 510 U. S., at 23 ("[W]hether an environment is 'hostile' or 'abusive' can be determined only by

_____

[5] Even the Seventh Circuit, whose definition of supervisor the Court adopts in large measure, has candidly acknowledged that, under its definition, supervisor status is not a clear and certain thing. See *Doe* v. *Oberweis Dairy*, 456 F. 3d 704, 717 (2006) ("The difficulty of classification in this case arises from the fact that Nayman, the shift supervisor, was in between the paradigmatic classes [of supervisor and co-worker]. He had supervisory responsibility in the sense of authority to direct the work of the [ice-cream] scoopers, and he was even authorized to issue disciplinary write-ups, but he had no authority to fire them. He was either an elevated coworker or a diminished supervisor.").

looking at all the circumstances.").[6]    The question of supervisory status, no less than the question whether retaliation or harassment has occurred, "depends on a constellation of surrounding circumstances, expectations, and relationships." *Oncale*, 523 U. S., at 81–82.  The EEOC's Guidance so perceives.

## B

As a consequence of the Court's truncated conception of supervisory authority, the *Faragher* and *Ellerth* framework has shifted in a decidedly employer-friendly direction.    This realignment will leave many harassment victims without an effective remedy and undermine Title VII's capacity to prevent workplace harassment.

The negligence standard allowed by the Court, see *ante*, at 24, scarcely affords the protection the *Faragher* and *Ellerth* framework gave victims harassed by those in control of their lives at work.  Recall that an employer is negligent with regard to harassment only if it knew or should have known of the conduct but failed to take appropriate corrective action.    See 29 CFR §1604.11(d); EEOC Guidance 405:7652 to 405:7653.  It is not uncommon for employers to lack actual or constructive notice of a harassing employee's conduct.  See Lindemann & Grossman 1378–1379.  An employee may have a reputation as a harasser among those in his vicinity, but if no complaint makes its way up to management, the employer will escape liability under a negligence standard.  *Id.,* at 1378.

––––––––––

[6] The Court worries that the EEOC's definition of supervisor will confound jurors who must first determine whether the harasser is a supervisor and second apply the correct employer liability standard. *Ante*, at 22–24, and nn. 13, 14.  But the Court can point to no evidence that jury instructions on supervisor status in jurisdictions following the EEOC Guidance have in fact proved unworkable or confusing to jurors. Moreover, under the Court's definition of supervisor, jurors in many cases will be obliged to determine, as a threshold question, whether the alleged harasser possessed supervisory authority.  See *supra*, at 15–16.

*Faragher* is illustrative. After enduring unrelenting harassment, Faragher reported Terry's and Silverman's conduct informally to Robert Gordon, another immediate supervisor. 524 U. S., at 782–783. But the lifeguards were "completely isolated from the City's higher management," and it did not occur to Faragher to pursue the matter with higher ranking city officials distant from the beach. *Id.,* at 783, 808 (internal quotation marks omitted). Applying a negligence standard, the Eleventh Circuit held that, despite the pervasiveness of the harassment, and despite Gordon's awareness of it, Boca Raton lacked constructive notice and therefore escaped liability. *Id.,* at 784–785. Under the vicarious liability standard, however, Boca Raton could not make out the affirmative defense, for it had failed to disseminate a policy against sexual harassment. *Id.,* at 808–809.

On top of the substantive differences in the negligence and vicarious liability standards, harassment victims, under today's decision, are saddled with the burden of proving the employer's negligence whenever the harasser lacks the power to take tangible employment actions. *Faragher* and *Ellerth*, by contrast, placed the burden squarely on the employer to make out the affirmative defense. See *Suders*, 542 U. S., at 146 (citing *Ellerth*, 524 U. S., at 765; *Faragher*, 524 U. S., at 807). This allocation of the burden was both sensible and deliberate: An employer has superior access to evidence bearing on whether it acted reasonably to prevent or correct harassing behavior, and superior resources to marshal that evidence. See 542 U. S., at 146, n. 7 ("The employer is in the best position to know what remedial procedures it offers to employees and how those procedures operate.").

Faced with a steeper substantive and procedural hill to climb, victims like Yasharay Mack, Donna Rhodes, Clara Whitten, and Monika Starke likely will find it impossible to obtain redress. We can expect that, as a consequence of

restricting the supervisor category to those formally empowered to take tangible employment actions, victims of workplace harassment with meritorious Title VII claims will find suit a hazardous endeavor.[7]

Inevitably, the Court's definition of supervisor will hinder efforts to stamp out discrimination in the workplace. Because supervisors are comparatively few, and employees are many, "the employer has a greater opportunity to guard against misconduct by supervisors than by common workers," and a greater incentive to "screen [supervisors], train them, and monitor their performance." *Faragher*, 524 U. S., at 803. Vicarious liability for employers serves this end. When employers know they will be answerable for the injuries a harassing jobsite boss inflicts, their incentive to provide preventative instruction is heightened. If vicarious liability is confined to supervisors formally empowered to take tangible employment actions, however, employers will have a diminished incentive to train those who control their subordinates' work activities and schedules, *i.e.,* the supervisors who "actually interact" with employees. *Ante*, at 26.

### IV

I turn now to the case before us. Maetta Vance worked as substitute server and part-time catering assistant for Ball State University's Banquet and Catering Division. During the period in question, she alleged, Saundra Davis, a catering specialist, and other Ball State employees subjected her to a racially hostile work environment. Applying controlling Circuit precedent, the District Court and Seventh Circuit concluded that Davis was not Vance's

_____

[7] Nor is the Court's confinement of supervisor status needed to deter insubstantial claims. Under the EEOC Guidance, a plaintiff must meet the threshold requirement of actionable harassment and then show that her supervisor's authority was of "sufficient magnitude" to assist in the harassment. See EEOC Guidance 405:7652, 405:7654.

supervisor, and reviewed Ball State's liability for her conduct under a negligence standard.  646 F. 3d 461, 470–471 (2011); App. to Pet. for Cert. 53a–55a, 59a–60a.  Because I would hold that the Seventh Circuit erred in restricting supervisor status to employees formally empowered to take tangible employment actions, I would remand for application of the proper standard to Vance's claim. On this record, however, there is cause to anticipate that Davis would not qualify as Vance's supervisor.[8]

Supervisor status is based on "job function rather than job title," and depends on "specific facts" about the working relationship.  EEOC Guidance 405:7654.  See *supra,* at 13.  Vance has adduced scant evidence that Davis controlled the conditions of her daily work.  Vance stated in an affidavit that the general manager of the Catering Division, Bill Kimes, was charged with "overall supervision in the kitchen," including "reassign[ing] people to perform different tasks," and "control[ling] the schedule." App. 431.  The chef, Shannon Fultz, assigned tasks by preparing "prep lists" of daily duties.  *Id.,* at 277–279, 427. There is no allegation that Davis had a hand in creating these prep lists, nor is there any indication that, in fact, Davis otherwise controlled the particulars of Vance's workday.  Vance herself testified that she did not know whether Davis was her supervisor.  *Id.,* at 198.

True, Davis' job description listed among her responsibilities "[l]ead[ing] and direct[ing] kitchen part-time, substitute, and student employee helpers via demonstra-

_____

[8] In addition to concluding that Davis was not Vance's supervisor, the District Court held that the conduct Vance alleged was "neither sufficiently severe nor pervasive to be considered objectively hostile for the purposes of Title VII."  App. to Pet. for Cert. 66a.  The Seventh Circuit declined to address this issue.  See 646 F. 3d 461, 471 (2011).  If the case were remanded, the Court of Appeals could resolve the hostile environment issue first, and then, if necessary, Davis' status as supervisor or co-worker.

tion, coaching, and overseeing their work." *Id.*, at 13. And another employee testified to believing that Davis was "a supervisor." *Id.,* at 386. But because the supervisor-status inquiry should focus on substance, not labels or paper descriptions, it is doubtful that this slim evidence would enable Vance to survive a motion for summary judgment. Nevertheless, I would leave it to the Seventh Circuit to decide, under the proper standard for supervisory status, what impact, if any, Davis' job description and the co-worker's statement should have on the determination of Davis' status.[9]

## V

Regrettably, the Court has seized upon Vance's thin case to narrow the definition of supervisor, and thereby manifestly limit Title VII's protections against workplace harassment. Not even Ball State, the defendant-employer in this case, has advanced the restrictive definition the Court adopts. See *supra,* at 5. Yet the Court, insistent on constructing artificial categories where context should be key, proceeds on an immoderate and unrestrained course to corral Title VII.

Congress has, in the recent past, intervened to correct this Court's wayward interpretations of Title VII. See Lilly Ledbetter Fair Pay Act of 2009, 123 Stat. 5, superseding *Ledbetter* v. *Goodyear Tire & Rubber Co.*, 550 U. S. 618 (2007). See also Civil Rights Act of 1991, 105 Stat. 1071, superseding in part, *Lorance* v. *AT&T Technologies, Inc.*, 490 U. S. 900 (1989); *Martin* v. *Wilks*, 490 U. S. 755 (1989); *Wards Cove Packing Co.* v. *Atonio*, 490 U. S. 642

---

[9] The Court agrees that Davis "would probably not qualify" as Vance's supervisor under the EEOC's definition. *Ante*, at 28–29. Then why, one might ask, does the Court nevertheless reach out to announce its restrictive standard in this case, one in which all parties, including the defendant-employer, accept the fitness for Title VII of the EEOC's Guidance? See *supra,* at 5.

(1989); and *Price Waterhouse* v. *Hopkins*, 490 U. S. 228 (1989). The ball is once again in Congress' court to correct the error into which this Court has fallen, and to restore the robust protections against workplace harassment the Court weakens today.

\*     \*     \*

For the reasons stated, I would reverse the judgment of the Seventh Circuit and remand the case for application of the proper standard for determining who qualifies as a supervisor.