IKUTA, Circuit Judge,
dissenting:
An employer is liable for sexual harassment under Title VII only if it engages in discriminatory conduct that alters the “terms, conditions, or privileges of employment, because of ... sex.” 42 U.S.C. § 2000e-2(a)(l). Courts may conclude that abusive conduct is “discriminat[ion] ... because of ... sex,” id., based on evidence that “members of one sex [were] exposed to disadvantageous terms or conditions of employment to which members of the other sex [were] not exposed,” Oncale v. Sun-downer Offshore Servs., Inc., 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 25, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (Ginsburg, J., concurring)). Because there is no evidence in the record that the Idaho Department of Corrections (IDOC) treated any female employee differently because of her sex, it is impossible to point to any such discrimination here. Nevertheless, the majority concludes that the IDOC may have violated Title VII because it abstained from damaging an employee’s reputation while an investigation into the employee’s alleged misconduct was still pending. In reaching this conclusion, the majority ignores Supreme Court precedent directly on point and writes “because of ... sex” out of the statute. See id. at 80-81, 118 S.Ct. 998.1 dissent.[1]
I
The threshold flaw in the majority’s analysis is its misapprehension of the summary judgment standard.
A
A party seeking summary judgment must demonstrate that “there is no genuine dispute as to any material fact” and that the party “is entitled to judgment as a matter of law.” Fed. R. Civ. P. 56(a). A material fact is one that “might affect the outcome of the suit under the governing law,” and a genuine dispute is one for which “a reasonable jury could return a verdict for the nonmoving party.” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). We draw inferences “in the light most .favorable to the nonmoving party,” but only if the inferences are rational or reasonable. T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass’n, 809 F.2d 626, 631 *1169 (9th Cir. 1987). “Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party,” even if the jury credited the nonmoving party’s evidence and drew all reasonable inferences in the nonmoving party’s favor, then “there is no genuine issue for trial” and the moving party is entitled to summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal quotation marks omitted).
Taking this record as a whole and drawing all reasonable inferences in favor of Fuller, no reasonable jury could conclude that the IDOC engaged in “discrimination] ... because of ... sex,” 42 U.S.C. § 2000e-2(a)(l), a necessary element of Fuller’s Title VII claim. Because no reasonable jury could return a verdict in Fuller’s favor, the IDOC is entitled to judgment as a matter of law. Rather than consider the record as a whole, however, the majority focuses only on those circumstances favoring Fuller.[2] This is a misapprehension of the summary judgment standard; we must credit Fuller’s evidence where a conflict exists (there are no such conflicts in this case), and we must draw all reasonable inferences in her favor, but we cannot ignore undisputed evidence simply because it is unhelpful to her case or make inferences that are unreasonable. Because the majority fails to recite all the relevant, undisputed facts (and therefore mistakes unreasonable inferences for reasonable ones), I provide them here.
B
Fuller and Herbt Cruz first met while coworkers at the IDOC. A few months after their first meeting, they embarked on a voluntary romantic relationship. By all accounts, their relationship was ordinary and functional from its genesis through the late summer of 2011. But events in August and September of that year tore the relationship apart and set this lawsuit into motion.
The key facts for this story begin, in large part, on August 15, 2011. That was the day the IDOC placed Cruz on paid administrative leave after learning that the Canyon County Sheriffs Office was investigating allegations that he raped a woman identified as “J.W.” That same day, IDOC supervisor Kim Harvey announced at a staff meeting that Cruz was on administrative leave due to an investigation. He also said, in passing, that he hoped things would be cleared up so that Cruz could return to work. Fuller, who was still in a romantic relationship with Cruz at the time, was in attendance at that staff meeting. She was unaware, however, of the nature of the allegations against Cruz.
While Cruz was on administrative leave, he received supportive phone calls from his friends, coworkers, and even from IDOC supervisors. Fuller was aware of these contacts; she and Cruz were still dating, so she would overhear Cruz on the phone, or Cruz would simply tell her about the calls. She also knew that Cruz “had various friends that worked for the department” who were reaching out to him. As for the IDOC supervisors, all Fuller ever knew was that Cruz spoke with them “on a couple of occasions.”[3]
It was not until late August and early September that Fuller and Cruz’s relation *1170 ship turned sour. In the span of those few weeks, Fuller alleges that Cruz raped her on three different occasions.[4] Each incident occurred while the two were away from work and on their own private time.
So how did this become a workplace harassment issue? The IDOC learned of the alleged rapes in early September 2011 when Fuller’s Mend, Renee Bevry, showed Harvey photographs of Fuller’s bruises and said “you need to be aware of this.” Harvey immediately notified the IDOC’s professional standards office and local law enforcement of this further allegation that Cruz had engaged in serious misconduct, and he then met with Fuller to find out what happened and to encourage her to report her allegations to the sheriff. When Fuller agreed, Harvey accompanied her to an interview with law enforcement to report her accusations, and he took her to lunch the day she reported. At that lunch, Harvey mentioned that there had been prior accusations of misconduct against Cruz, but did not provide any further information. Afterwards, Harvey escorted Fuller home and searched her house before she entered to make sure no one was inside. Once Fuller had collected some personal items, he then took her to Bevry’s home, where she felt safer staying.
As Harvey correctly indicated to Fuller, Cruz had been on the receiving end of complaints more than once before.[5] The record shows that the IDÓC investigated and addressed each of these complaints. In early 2003, Sandra Martin, an IDOC employee, alleged that Cruz had shown romantic interest in her by abandoning his post to follow her into the recreation yard where she was monitoring inmates. Martin also accused Cruz of taking her car keys. Martin made clear to the IDOC' that she perceived this as sexual behavior, and the IDOC investigated the allegations and met with all concerned parties. Martin eventually sued the IDOC in 2006, alleging sexual harassment by Cruz and another male employee, but the lawsuit was resolved by final judgment in the IDOC’s favor. See Martin v. Idaho Dep’t of Corr., No. 06-cv-55, 2007 WL 1667597 (D. Idaho June 7, 2007). In 2010, Letticia Davila, an IDOC employee, expressed concern about reports that Cruz might be transferred to her office. Her concern arose from a long ago training session in which Cruz portrayed an offender attempting to take over Davi-la’s office by force. Davila stated that Cruz took “his role-playing too seriously,” and blocked her office door when she tried to leave; he moved out of the way, however, when she threatened to knee him. Davila stated she did not perceive Cruz’s conduct as sexual. She also told the IDOC that in 2008, Cruz had behaved inappropriately with one of her coworkers by putting a hand on the woman’s knee. When interviewed by the IDOC, the coworker stated that, in her view, no sexual harassment had occurred and that her interaction with Cruz was “not a big deal.” Because the investigation disclosed no misconduct, the IDOC did not discipline Cruz.[6] However, the IDOC decided not to transfer Cruz to *1171 the office where Davila worked, and Harvey told his staff to “watch [Cruz] and see if there’s any further incidents that you think are inappropriate.”
The day after Fuller reported her allegations to the police, she obtained the first of several confidential civil protection orders prohibiting Cruz from being within 1,000 feet of Fuller or her workplace. That same day, Harvey sent an email to IDOC staff in which he informed all staff members that Cruz “cannot come to the office until the investigation is complete and cannot “talk to anyone in the Department about the investigation,” although the staff was free to talk to him and “give him some encouragement.”[7]
Around this same period, Fuller took some time away from work. She did not need to request this time off, because the IDOC told her that she “could take as much time as [she] needed.” In addition, Harvey told Fuller that he would investigate whether Fuller qualified for pay during her leave. In mid-September, IDOC Deputy Chief Henry Atencio informed Fuller via email that the IDOC would not offer .Fuller paid administrative leave, based on the IDOC’s longstanding practice to extend paid leave only “when there is departmental action against the employee, such as an investigation.” In that same email, Atencio told Fuller that she was free to use her sick leave and vacation balances. After Atencio denied Fuller’s request for paid administrative leave, she applied for leave under the Family and Medical Leave Act, and the IDOC promptly approved that request.
While Fuller was on leave, her supervisors at the IDOC were working towards ways to accommodate her situation. For example, on September 15—the day Fuller had to appear in court to renew her confidential civil protection order—Harvey called to check in with her. During that call, Harvey told Fuller “that if she is not comfortable with coming back to work” at her division, Harvey “would do what [he] could to help her transfer.” Later in that month, Harvey continued to try to check in with Fuller, but to no avail. He “attempted to contact her by phone, leaving messages that [were] not returned,” and he “even went by her house[,] ... but she was not there.” Atencio and the other supervisors were aware of Harvey’s efforts, which he communicated to them via email.[8]
In late October, Fuller emailed Atencio to inform him of her reluctant decision to return to work. In her email, she stated it was a “sad day” that Cruz “gets to sit at home and collect a check at the tax payers expense” while she was denied paid administrative leave. Although she was “appalled by the way this situation has been handled,” she stated that she had “exhausted all leave and am now forced to return to *1172 work against my Doctor, Counselor, and Attorney’s recommendation.”[9] Because Fuller’s doctor certified that Fuller was “unable to concentrate and perform,” suffered from “severe anxiety,” and was “unsafe to carry [a] weapon,” the IDOC placed her on modified duty. Upon her return, Fuller found the IDOC to be a “completely uncomfortable work environment,” in which her coworkers ostracized her because they believed she had been “faking” a medical issue. But the coworkers knew nothing about her alleged rapes. Indeed, no one made any comments about the rapes (or sexually suggestive comments more generally), and no one suggested that Fuller had done anything inappropriate.
On November 6, a little over two weeks after her return, Fuller submitted a letter to Atencio outlining why she believed that the IDOC should reverse course and grant her paid administrative leave. She identified eight reasons: (1) she had incurred significant expenses in retaining an attorney to obtain her confidential civil protection orders; (2) it was “unbecoming” that Cruz, who was suspended pending a disciplinary investigation, receive paid leave but not her; (3) the IDOC was paying Cruz even though policy provided for unpaid suspension when an employee was indicted on felony charges;[10] (4) Cruz was being extended a “courtesy”; (5) the IDOC failed in its obligation to provide Fuller with information about filing a harassment complaint; [11] (6) Cruz was a threat to safety; (7) paid administrative leave was discretionary; [12] and (8) “the department conducted an investigation which found Mr. Cruz innocent of a crime.” [13] This letter prompted a meeting between Fuller and IDOC officials on November 10.
At the November 10 meeting, which Fuller surreptitiously recorded, Atencio explained the IDOC’s neutral policy for extending paid administrative leave only to employees (like Cruz) who were under investigation. Fuller argued that the Standard Operating Procedure “clearly states” that the IDOC could award paid leave “under unusual circumstances.”[14] Atencio *1173 acknowledged that the manual contained such language, but stated that “in discussing this with the leadership, and with HR,, we don’t think that the situation rises to that point where it’s unusual, and would warrant leave with pay.”[15]
Later in the meeting, Fuller requested that her IDOC coworkers be informed of her confidential civil protection order against Cruz. Atencio responded that, although he knew that Fuller would find it “distasteful,” the IDOC could not comply with that request because “Cruz is still our employee and we have to be cautious of his rights.” But Atencio proposed a compromise: If the legal team verified that it was lawful to do so, the IDOC would send a reminder email to employees that Cruz was under investigation and not allowed at IDOC premises and that employees should contact a supervisor immediately if Cruz comes to the IDOC workplace. Atencio also informed Fuller that the IDOC would work with her to arrange for days when Fuller could take leave with pay to attend court hearings “and have time afterwards to recover.”
As had been proposed at the November 10 meeting, Harvey sent an email on November 16 reminding employees that Cruz “is on leave pending an investigation” and “not allowed in the [IDOC] offices.” Employees were further instructed to “contact a supervisor” if Cruz was seen on premises. The supervisors were aware of Fuller’s civil • protection order, Fuller knew they were aware of the order, and the supervisors knew to contact police if Cruz came to the IDOC’s premises. Fuller later explained that if the IDOC had sent an email notifying the staff that there was a civil protection order against Cruz, she “never would have resigned.”
At the time Fuller resigned on November 16, IDOC supervisors were in the process of terminating Cruz’s employment. By November 8, three supervisory IDOC officials had concluded that Cruz was responsible for multiple misconduct violations, including ones relating to Fuller’s allegations. In late December, Cruz was formally notified that the IDOC was contemplating his termination, and he resigned on January 9, 2012.
II
The question in this case is whether these circumstances are sufficient, as a matter of law, to create a sexually hostile work environment. In holding that they are, the majority has lost sight of the key elements of Title VII liability, and effectively holds that an employer can be found liable even in the absence of evidence that any workplace conduct is “discrimination] *1174 ... because of ... sex.” 42 U.S.C. § 2000e-2(a)(l).
A
Title VII of the Civil Rights Act of 1964 makes it “an unlawful employment practice for an employer ... to discriminate against any individual with respect to ... terms, conditions, or privileges of employment, because of such individual’s ... sex.” Id,.[16] This prohibition does not expressly ban “sexual harassment,” but the Supreme Court has held that discriminatory conduct includes sexual harassment, Meritor, 477 U.S. at 64, 106 S.Ct. 2399 (1986), and that such conduct can alter the terms and conditions of employment if it is “sufficiently severe or pervasive” that it creates “an abusive working environment,” Harris, 510 U.S. at 21, 114 S.Ct. 367. But as the statutory language makes clear, the key elements of a Title VII sexual harassment claim are (1) that the employer has engaged in discriminatory conduct (2) that affected the “terms, conditions, or privileges of employment” (3) because of such individual’s sex. 42 U.S.C. § 2000e-2(a)(l).
In concluding that sexual harassment is discriminatory conduct, the Supreme Court looked to the EEOC Guidelines, which define sexual harassment to include both “[u]nweleome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature,” as well as claims that are not quid pro quo, namely “so-called ‘hostile environment’ ... harassment.” Meritor, 477 U.S. at 65, 106 S.Ct. 2399. This can include “discriminatory intimidation, ridicule, and insult,” Harris, 510 U.S. at 21, 114 S.Ct. 367, such as the use of “sex-specific and derogatory terms,” Oncale, 523 U.S. at 80, 118 S.Ct. 998.
In order to affect the terms or conditions of employment, the discriminatory conduct must be unwelcome and either severe or pervasive. See Gregory v. Widnall, 153 F.3d 1071, 1074 (9th Cir. 1998) (per curiam). “[T]he work environment must both subjectively and objectively be perceived as abusive.” Little v. Windermere Relocation, Inc., 301 F.3d 958, 966 (9th Cir. 2002) (quoting Fuller v. City of Oakland, 47 F.3d 1522, 1527 (9th Cir. 1995)). In making this determination, “we look ‘at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee’s work performance.’” Id. (quoting Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 270-71, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per curiam)). We undertake this analysis from the perspective of “a reasonable woman.” Ellison v. Brady, 924 F.2d 872, 879 (9th Cir. 1991).
When engaging in a hostile work environment analysis, however,, we must remember the Supreme Court’s repeated admonishment that “Title VII does not prohibit all verbal or physical harassment in the workplace.” Oncale, 523 U.S. at 80, 118 S.Ct. 998; see also Vance v. Ball State Univ., — U.S. —, 133 S.Ct. 2434, 2455, 186 L.Ed.2d 565 (2013) (“Title VII imposes no ‘general civility code.’ ”); Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (similar). Rather, a plaintiff must always prove *1175 that complained-of conduct occurred because of the individual’s sex. Oncale, 523 U.S. at 80, 118 S.Ct. 998. There are multiple evidentiary routes a plaintiff can follow to establish this critical element. “Courts and juries have found the inference of discrimination easy to draw in most male-female sexual harassment situations, because the challenged conduct typically involves explicit or implicit proposals of sexual activity; it is reasonable to assume those proposals would not have been made to someone of the same sex.” Id. Alternatively, where an employer treats men and women unequally, a trier of fact may infer that the differential conduct is because of sex. Id. at 80-81, 118 S.Ct. 998 (“A same-sex harassment plaintiff may also, of course, offer direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace.”). Drawing on Oncale, we have held that where the conduct at issue “is not facially sex- or gender-specific,” we may consider “differences in subjective effects” on women, “along with ... evidence of differences in objective quality and quantity,” in “determining whether or not men and women were treated differently.” EEOC v. Nat’l Educ. Ass’n, Alaska, 422 F.3d 840, 845-46 (9th Cir. 2005). Nevertheless, the “main factual question” is whether the alleged perpetrator’s “treatment of women differed sufficiently in quality and quantity from his treatment of men to support a claim of sex-based discrimination.” Id. at 844. “Whatever eviden-tiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted ‘discrimination] ... because of ... sex.’ ” Oncale, 523 U.S. at 81, 118 S.Ct. 998.
B
Contrary to the majority, I would hold that Fuller has not raised a genuine issue of material fact regarding any of the three elements of a Title VII claim. There is no triable issue that the IDOC engaged in unwelcome harassing conduct of any sort, nor that the IDOC’s conduct created a working environment so abusive that it altered the terms and conditions of Fuller’s employment. Cf. Gregory, 153 F.3d at 1074. But even if there were a triable issue on these two elements, Fuller’s action would fail because there is not a shred of evidence to show that any conduct in the workplace was “because of ... sex.” 42 U.S.C. § 2000e-2(a)(l). The majority has no answer to this dispositive flaw, which is fatal to Fuller’s case.
Although a plaintiff may use many evi-dentiary routes to raise an inference of discrimination because of sex, see Oncale, 523 U.S. at 80, 118 S.Ct. 998, Fuller has no viable route to follow. A court may infer discrimination because of sex when the conduct at issue is sexual in nature, but it is undisputed that Fuller experienced no “[ujnwelcome sexual advances” or “requests for sexual favors” at the IDOC. 29 C.F.R. § 1604.11(a). Nor did Fuller present any evidence of “verbal or physical conduct of a sexual nature” in the workplace. Id. There is no evidence that anyone at the IDOC was “motivated by general hostility to the presence of women in the workplace,” nor is there “direct comparative evidence” that Fuller was treated differently from any similarly situated male. Oncale, 523 U.S. at 80-81, 118 S.Ct. 998. The record is entirely devoid of evidence that the IDOC engaged in differential treatment of Fuller because she is a woman. Because Fuller has failed to raise a genuine issue whether the conduct she deemed to be abusive was “because of ... sex,” 42 U.S.C. § 2000e-2(a)(l), her claim fails.
Having properly rejected Fuller’s claim that the rapes were part of the hostile *1176 work environment, Maj. op. at 1162 n.7, the majority relies primarily on three incidents: (1) Harvey’s statement at a staff meeting that he hoped Cruz could return, and his later email telling employees that they were allowed to speak to Cruz, id. at 1162; (2) Harvey’s comment that Cruz had previously been accused of sexual harassment, id. at 1162; and (3) Atencio’s refusal to disclose Fuller’s confidential civil protection order in favor of sending a more general email that Cruz was not allowed at the IDOC pending the completion of his investigation, id. at 1162. While Fuller found this conduct offensive, there is no evidence in the record to support a claim that the IDOC took these measures because Fuller is a woman.[17]
The majority rests its holding on Little v. Windermere Relocation, Inc., see Maj. op. at 1162, but this case provides no support. The plaintiff in Little worked in business development to cultivate corporate clients. 301 F.3d at 964. As part of the plaintiffs job, the president of her company directed her to “do whatever it takes” to obtain a Starbucks account for the firm. Id. To that end, the plaintiff met with a Starbucks officer on several occasions, including once over dinner and drinks. Id. After dinner, the plaintiff passed out and was raped multiple times by the Starbucks officer. Id. When the employee reported the rape to the employer, the company president expressed his displeasure with her report, reduced her salary, and ultimately “told her it would be best if she moved on and that she should clean out her desk.” Id. at 965. We held that the rape was part of the employee’s work environment because “[hjaving out-of-office meetings with potential clients was a required part of the job” and “[tjhe rape occurred at a business meeting with a business client.” Id. at 967. As such, we concluded that the employee had raised triable issues as to all three elements of a Title VII hostile work environment claim. The rape was “unquestionably among the most severe forms of sexual harassment”; “[bjeing raped by a business associate, while on the job, irrevocably alters the conditions of the victim’s work environment”; and “[bjeing raped is, at minimum, an act of discrimination based on sex.” Id. at 967, 968.
Little distinguished a prior opinion holding that “a ‘single incident’ of harassment” (in that case, an employee’s forcing “his hand underneath [a female employee’s] sweater and bra to fondle her bare breast,” Brooks v. City of San Mateo, 229 F.3d 917, 921 (9th Cir. 2000)), which was “followed by immediate corrective action by the employer,” did not create a hostile work environment because it “was not sufficiently ‘severe or pervasive.’ ” Little, 301 F.3d at 967 (citing Brooks, 229 F.3d at 925-26). Little reasoned that Brooks did not control because in that case, “the harassing employee was fired,” but in Little, “not only was there no remediation, the harassment was arguably reinforced by *1177 [the victim’s] employer.” Id. In other words, the foundation for Title VII liability in Little was the failure to remedy a serious incident of workplace sexual harassment, coupled with the employer’s further abusive treatment of the victim by, for example, cutting her pay, which “reinforced rather than remediated the harassment.” Id.
By contrast to Little, Fuller’s rapes were unrelated to her “employment.” See Fuller, — Fed.Appx. at -; Maj. op. at 1162 n.7. Accordingly, Fuller cannot rely on the rapes as evidence that she suffered a severe form of sexual harassment on the job, which altered the terms and conditions of her work environment and constituted discrimination on the basis of sex. Little neither requires the IDOC to remedy harassment that occurs outside the context of work, nor holds that inadequate remediation of such harassment evinces discrimination because of sex. Thus, as the IDOC correctly argues, if the rapes do not qualify as workplace conduct, then there was no sexual harassment in the workplace. Because no other evidence suggests hostility towards women or disparate treatment of women, it follows that Fuller was not harassed “because of ... sex.” 42 U.S.C. § 2000e-2(a)(l).
The majority contends that an employer’s discrimination against a female employee because the female employee had been raped could constitute discrimination based on sex, whether the rape occurred at the workplace or outside the workplace. Maj. op. at 1166. Although Little does not directly support such a rule,[18] harassing conduct undertaken against a female employee because of a rape (whether in or outside of the workplace) might give rise to a reasonable inference of discrimination because of sex and therefore support a Title VII claim. The majority also argues that when an employer “effectively condone[s] or ratifies a rape or sexual assault and its effects,” the employer may be deemed to be discriminating against the raped or assaulted employee “because of sex.” Maj. op. at 1166 (internal quotation marks omitted). The majority declines to explain what constitutes condoning or ratifying a rape, id. at 1166-67, but in Little we held that an employer condoned a workplace rape by attempting to silence the employee’s complaint, cutting her pay, and ultimately firing her. 301 F.3d at 965. One can imagine circumstances where such a response to a non-workplace rape or assault could constitute discriminatory conduct based on sex that is so severe and pervasive as to affect the terms of employment.
Fuller, however, has not created a genuine issue for trial that any conduct—discrimination against an employee because the employee was raped, or conduct condoning or ratifying a rape—occurred here. By contrast to Little, the IDOC never attempted to silence Fuller’s complaint, cut her pay, or fire her. Rather, the record here indisputably shows that the IDOC took immediate remedial steps in response to Fuller’s complaints, even though her complaints were not based on workplace conduct. When Fuller reported her allegations to the IDOC, Cruz was already separated from the workplace, the IDOC warned employees that he could not be on premises, and at no point did anyone with the authority to speak on the IDOC’s behalf tell Fuller (or any IDOC employee) that Cruz had been exonerated or would return. Instead, the IDOC diligently inves *1178 tigated Fuller’s allegations, believed them, and ultimately used them as the basis of the decision to terminate Cruz’s employment. Cf. Brooks, 229 F.3d at 922 (noting the employer’s “prompt remedial action” in investigating an incident and initiating termination proceedings against a misbehaving employee, who ultimately resigned).[19] Even under the majority’s expansive reading of Little, no reasonable jury would equate an employer’s decision to terminate an employee accused of harassment with condoning the employee’s behavior.
In the absence of any evidence of “dis-criminat[ion] ... because of ... sex,” 42 U.S.C. § 2000e-2(a)(l), the majority points out that Fuller is a woman, but some of her IDOC supervisors were men. Maj. op. at 1167. But we long ago held that the mere fact that a plaintiff is a different sex from her alleged harassers “is not suffi-v cient to raise a jury question.” Gregory, 153 F.3d at 1075. This might be different if there were “a debatable question as to the objective differences in treatment of male and female employees” at the hands of the supervisors. NEA, 422 F.3d at 846. But on this record there is no evidence that Fuller was treated differently from any male employee, and so no inference of discrimination arises.[20] Id.; see also Oncale, 523 U.S. at 80, 118 S.Ct. 998.
The conduct that the majority deems to be abusive—the IDOC’s refusal to denigrate Cruz merely because he was accused of wrongdoing—was proper and perhaps legally necessary. Public employees can have a constitutionally protected property interest in their employment, and they are entitled to fair procedures before that interest is terminated. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 543, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Similarly, public employees have a protected liberty interest at stake; a public employee may sue an employer where contested, stigmatizing information about the employee is publicly disclosed in connection with the employee’s termination. E.g., Guzman v. Shewry, 552 F.3d 941, 955 (9th Cir. 2009). The IDOC had an obligation of constitutional magnitude to tread carefully with its disclosure of any stigmatizing charges against Cruz until Cruz had been afforded an appropriate, opportunity to clear his name. These concerns made it reasonable for the IDOC to decline to reveal any information about the charges against Cruz until those charges had been substantiated, and to decline to . disclose Fuller’s confidential civil protection order against Cruz in favor of an email that alerted employees that Cruz was not allowed on IDOC premises in a more neutral manner. I would hold that the IDOC’s decision to avoid prematurely injuring Cruz’s reputation was not discriminatory conduct that is objectively abusive. But in any event, the IDOC’s treatment of Cruz *1179 cannot support an inference of discrimination because of sex.
Ill
Even if the IDOC’s actions upset Fuller, subjective perception of abuse is not enough to prevail on a Title VII claim; the abuse must be “discriminat[ion] ... because of ... sex.” 42 U.S.C. § 2000e-2(a)(1); Oncale, 523 U.S. at 80, 118 S.Ct. 998. On this record, there is no evidence of workplace sexual abuse, cf. Little, 301 F.3d at 968, no evidence of supervisors’ addressing Fuller in any manner evincing hostility or sexual desire, cf. Oncale, 523 U.S. at 80, 118 S.Ct. 998, and no evidence that “members of one sex [were] exposed to disadvantageous térms or conditions of employment to which members of the other sex [were] not exposed,” id. The IDOC did not give Fuller everything she wanted, but it applied facially neutral policies in denying some of her requests, and therefore did not discriminate against her because she is a woman. Rather, the only conclusion supported by this record is that the IDOC accommodated Fuller’s situation while respecting Cruz’s rights. In other words, this is the story of an employer that worked hard to do the right thing by effectively removing a potential threat from the workplace immediately and permanently, without smearing any employee’s reputation before an investigation had been completed. That it may nevertheless find itself liable is a testament not to its missteps, but to our failure to heed Oncale’s central lesson.
Because there was no “diseriminat[ion] ... because of ... sex” on this record, Title VII’s text and our precedents compel the conclusion that Fuller’s claim fails. 42 U.S.C. § 2000e-2(a)(l). I would therefore affirm the IDOC’s judgment in full, and I dissent from the majority’s contrary disposition.

. I concur in the concurrently filed memorandum disposition that affirms the district court's entry of summary judgment in the IDOC's favor on the remaining claims. See Fuller v. Idaho Dep't of Con., 694 Fed.Appx. 590, 2017 WL 3225875 (9th Cir. 2017).

. Indeed, the majority seems to think that it is an error to acknowledge undisputed facts that are not helpful to Fuller. See, e.g., Maj. op. at 1165 (criticizing the dissent for noting, among other undisputed facts, that Cruz has not been charged or convicted of rape, that Fuller had been in a consensual relationship with Cruz, and that Fuller had surreptitiously recorded the meeting with IDOC supervisors).

. Although the majority states that Fuller was aware that IDOC supervisors were "offering [Cruz] support during his suspension,” Maj. *1170 op. at 1162, there is nothing to this effect in the record.

.For purposes of summary judgment, we assume the truth of this allegation, which the IDOC neither denies nor concedes. It is undisputed that Cruz has never been charged or convicted of any misconduct with Fuller or J.W.

. Fuller admits that she never witnessed Cruz sexually harass a female employee at the IDOC.

. The majority conflates a failure to discipline with a failure to investigate, Maj. op. at 1165, and argues that the complaints against Cruz are probative of a general disrespect for woman at the IDOC, id. at 1162 n.8. This misrepresents our precedent; although actual sexual harassment of others can be probative of *1171 , attitudes toward women, unsubstantiated complaints are not. Compare id. (focusing on "knowledge of previous sexual harassment complaints”), with Zetwick v. County of Yolo, 850 F.3d 436, 445 (9th Cir. 2017) (focusing on "[t]he sexual harassment of others” that has been “shown to have occurred”).

. The email stated in full:
Just an update on Cruz. I talked to him. He sounds rather down, as to be expected. Said he is trying to stay busy. Just as a reminder—and this is always one thing I hate about these things—he cannot come to the office until the investigation is complete. Nor can he talk to anyone in the Department about the investigation. So, if you want to talk to him, give him some encouragement etc., please feel free. Just don’t talk about the investigation. At this point, I honestly don’t know the status of it.

. Fuller faults the IDOC because "Atencio did not ask Harvey to check on Fuller while on leave, in direct contrast to directing him to regularly check on Cruz.” This attempt to impute discriminatory animus falls flat in light of Atencio's knowledge that Harvey was checking on Fuller of his own volition.

. Although Fuller's email expresses her frus- . tration over the denial of paid administrative leave, which the majority agrees was not unlawful, the email cannot reasonably be interpreted to mean that Fuller was forced to return to work by anything but her own assessment of her financial situation, i.e., she could not afford not to return. Contra Maj. op. at 1163 (claiming that Fuller has “evidence” that she was "forced to return to work”). There is no evidence in the record that the IDOC ever instructed or required Fuller to return to work.

. As noted previously, it is undisputed that Cruz has never been criminally charged in relation to J.W.’s or Fuller’s allegations, so this ground was premised on a misapprehension of fact. See supra, note 4.

. As we hold today, no underlying workplace sexual harassment occurred because Fuller's rapes were not related to the workplace. See Fuller, - Fed.Appx. at -; Maj. op. at 1162 n.7. It follows that the IDOC had no such obligation.

. We hold today that Fuller has no evidence that the IDOC’s denial of her paid leave request was anything other than the lawful application of a neutral policy. See Fuller, - Fed.Appx. at -; Maj. op. at 1163 n.9.

. Fuller believed that the IDOC had exonerated Cruz based on a statement by the county sheriff, who in turn had allegedly heard the information from an unnamed source. Or, put more simply, this was second-hand gossip. There is no evidence that an IDOC official ever made any representation to Fuller that Cruz had been, or would be, exonerated.

. The IDOC’s Standard Operating Procedure Manual provided:
5. Paid Administrative Leave
The director of the IDOC, in consultation with the director of HRS and the applicable division chief, may grant paid administrative leave under the following conditions:
• When the employee is being investigated;
*1173 • When the employee is in the due process procedure of a disciplinary action;
• When the governor, manager, or des-ignees declare an IDOC facility closed or inaccessible because of severe weather, civil disturbances, loss of utilities, or other disruptions;
• When a manager (or designee) deems it necessary due to an unusual situation, emergency, or critical incident that could jeopardize IDOC operations, the safety of others, or could create a liability situation for the IDOC; or
• When approved in advance by the governor (or designee).

. The majority holds that Atencio's statement contributed to a hostile work environment because ’he "actually told Fuller” that "her situation was not 'unusual' enough to warrant paid leave, although her male rapist was entitled to such leave and his colleagues’ support.” Maj. op. at 1166 (emphasis in original). As the majority acknowledges, there is no evidence that the IDOC's limitation on paid administrative leave was anything other than a policy neutrally applied to all staff. See Maj. op. at 1163 n.9 (noting our unanimous holding that the denial of paid administrative leave did not violate Title VII). Verbalizing the neutral policy does not show discrimination on the basis of sex.

. This provision provides in full:
(a) Employer practices It shall be an unlawful employment practice for an employer—
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual’s race, color, religion, sex, or national origin[J

. The other circumstances cited by the majority likewise do not support any inference of "discrimination] ... because of ... sex.” 42 U.S.C. § 2000e-2(a)(l). For instance, the majority cites the phone calls to Cruz from IDOC supervisors, Maj. op. at 1162, but those were neither improper nor discriminatory. In fact, Fuller does not dispute that IDOC supervisors checked in on Fuller during her leave as well. Equally non-discriminatory was the denial of paid administrative leave, Maj. op. at 1163, which we unanimously conclude was not an employment action taken on account of sex, id. at 1163 n.9. The same is true of Fuller's ostracization by co-workers, id. at 1163, which not even Fuller has suggested was because of sex. And finally, the majority’s statement that Fuller was "forced” to return to work, id. at 1163, fails in light of the fact that Fuller undisputedly returned to work because she could not afford to take any more leave, not because the IDOC required her to return, see supra, note 9.

. Because Little relied on both (1) the plaintiff's rape "by a business associate, while on the job” (which Little identified as among the most severe forms of discrimination based on sex), and (2) the employer's response to the rape, the rule we announced in Little is not directly applicable to situations like Fuller's. 301 F.3d at 967-68.

. The majority's argument that Brooks is distinguishable because the employer in Broolcs "took no actions which could be perceived as supportive of the harasser or indicative that he might return,” Maj. op. at 1164, finds no basis in the Brooks opinion. Broolcs never mentions one way or the other what the employer did beyond investigating the incident and pursuing disciplinary action.

. The majority also notes that despite the lack of any evidence in the record that would allow a reasonable jury to conclude that Fuller was treated differently because of sex, we should nevertheless conclude there is a triable issue because women are "disproportionately victims” who have "different perspectives” from men. Maj. op. at 1168. This suggests that, were Fuller a man, the majority may have entertained a different outcome, given the "different perspectives” men might have about sex. Id. In many areas of the law, "[ojverbroad generalizations of that order” are inappropriate—indeed, constitutionally suspect. Sessions v. Morales-Santana, - U.S. -, 137 S.Ct. 1678, 1692, 1693 n.13, 198 L.Ed.2d 150 (2017).